EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Partido Nuevo Progresista<br><br>     Peticionario<br><br>          v.<br><br>Hon. Sila M. Calderón, Gobernadora Estado Libre Asociado de Puerto Rico, etc.<br><br>     Recurridos | Certiorari<br><br>2004 TSPR 105<br><br> 161 DPR _____ |

Número del Caso: CC-2004-131

Fecha: 21 de junio de 2004

Tribunal de Circuito de Apelaciones:

          Región Judicial de San Juan

Juez Ponente:

          Hon. Carlos Rivera Martínez

Abogados de la Parte Peticionaria:

          Lcdo. Rafael Sánchez Hernández
          Lcdo. Manuel J. Camacho Córdova
          Lcdo. Adrián O. Díaz Díaz

Abogados de la Parte Recurrida:

          Lcdo. Rafael Escalera Rodríguez
          Lcdo. Carlos A. del Valle Cruz
          Lcda. Lizette Mejías Avilés
          Lcdo. Pedro Santiago Rivera

Materia: Sentencia Declaratoria, Injunction

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Nuevo Progresista

    Peticionario


       vs.                  CC-2004-131       Certiorari

Hon. Sila M. Calderón,
Gobernadora, Estado Libre
Asociado de Puerto Rico, Etc.

    Recurridos


## SENTENCIA

San Juan, Puerto Rico, a 21 de junio de 2004.


El 20 de febrero de 2004 compareció ante nos el Partido Nuevo Progresista (P.N.P.), mediante un recurso de *certiorari*, para solicitar la revisión de la sentencia dictada en el caso de autos por el Tribunal de Apelaciones el 19 de diciembre de 2003, que fue notificada el 23 de diciembre del mismo año.

Luego de considerar a fondo el recurso aludido, los Jueces de este Tribunal se encuentran igualmente divididos en cuanto a sus votos con respecto al recurso. Ello en vista de la inhibición de la Jueza Asociada señora Fiol Matta.

La Jueza Presidenta señora Naveira Merly y los Jueces Asociados señores Hernández Denton y Fuster Berlingeri denegarían el recurso por haberse tornado

académico; los Jueces Asociados señores Rebollo López, Corrada del Río y Rivera Pérez expedirían.

Por estar igualmente dividido el Tribunal, y conforme a lo dispuesto en la Regla 4(a) del Reglamento del Tribunal Supremo de Puerto Rico, se expide el auto de *certiorari* solicitado y se dicta Sentencia confirmatoria de la emitida en el caso de autos por el foro apelativo.

Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez disiente con opinión escrita. La Juez Asociada señora Fiol Matta está inhibida.

Patricia Otón Olivieri
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Partido Nuevo Progresista

     Peticionario

        vs.

                           CC-2004-131

Hon. Sila María Calderón,
Gobernadora; Estado Libre
Asociado de Puerto Rico P/C
de la Hon. Anabelle Rodríguez

     Recurridos

Opinión Disidente emitida por el Juez Asociado señor Rivera Pérez.

San Juan, Puerto Rico, a 21 de junio de 2004.

Por estar igualmente dividido este Tribunal se expidió el auto de certiorari solicitado y se confirma la sentencia recurrida, emitida por el Tribunal de Apelaciones.[1] La Jueza Presidenta señora Naveira Merly y los Jueces Asociados señores Hernández Denton y Fuster Berlingeri emitieron voto para proveer no ha lugar al auto de certiorari solicitado por haberse tornado académico el asunto ante nos. Los Jueces Asociados señores Rebollo

---

[1] Regla 4(a) del Reglamento del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Apéndice AP. XXI-A R.4(a). Véase, además, Guerrero de León v. Ombusman 155 D.P.R.___, 2001 TSPR 170, 2001 J.T.S. 172; P.I.P. v. E.L.A. 109 D.P.R. 685 (1980); Pagán Hernández v. Alcaide 102 D.P.R. 101 (1974).

López, Corrada del Río y Rivera Pérez emitieron voto para expedir. La Jueza Asociada señora Fiol Matta inhibida. Muy respetuosamente DISIENTO del resultado por entender que el mismo es CONTRARIO e INCONSISTENTE con lo actuado y los pronunciamientos realizados por este Tribunal en **Emp. Pur. Des., Inc. v. H.I.E.TEL.**, 150 D.P.R. 924 (2000),[2] **P.P.D. v. Gobernador I**, 139 D.P.R. 643 (1995)[3] *y* **P.P.D. v. Gobernador II**, 139 D.P.R. 984 (1996).[4] Veamos.

---

[2] El entonces Juez Presidente señor Andréu García, la entonces Jueza Asociada señora Naveira Merly y los Jueces Asociados señores Negrón García, Hernández Denton y Fuster Berlingeri le imprimieron su conformidad a la opinión emitida. El Juez Asociado señor Rebollo López no intervino. El Juez Asociado señor Corrada del Río emitió opinión disidente en parte y concurrente en otra.

[3] El entonces Juez Presidente señor Andréu García, la entonces Jueza Asociada señora Naveira Merly y los Jueces Asociados señores Hernández Denton y Fuster Berlingeri le imprimieron su conformidad a la opinión emitida. El entonces Juez Asociado señor Negrón García emitió una opinión concurrente. Los Jueces Asociados señores Hernández Denton y Fuster Berlingeri emitieron opiniones de conformidad. Los Jueces Asociados señores Rebollo López y Corrada del Río emitieron opiniones concurrentes y disidentes.

[4] El entonces Juez Presidente señor Andréu García, la entonces Jueza Asociada señora Naveira Merly, los Jueces Asociados señores Hernández Denton y Fuster Berlingeri le imprimieron su conformidad a la Resolución emitida declarando no ha lugar la moción de reconsideración presentada por el entonces Gobernador de Puerto Rico, honorable Pedro Rosselló González y el Partido Nuevo Progresista. La entonces Jueza Asociada señora Naveira Merly emitió voto particular de conformidad. El entonces Juez Asociado señor Negrón García emitió voto concurrente. El Juez Asociado señor Rebollo López emitió voto particular. El Juez Asociado señor Corrada del Río hubiera reconsiderado el caso en su totalidad por las razones ya expuestas en su previa opinión disidente.

I

El 20 de marzo de 2003 la parte aquí peticionaria Partido Nuevo Progresista (en adelante P.N.P.) presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan una demanda sobre sentencia declaratoria e injunction. El P.N.P. solicitó al Tribunal de Primera Instancia que emitiera una sentencia declarando como inconstitucional el uso de fondos públicos en la producción y difusión de ciertos anuncios publicados por la administración de la honorable Sila M. Calderón Serra, Gobernadora de Puerto Rico (en adelante Gobernadora). La utilización de fondos públicos impugnada incluía la difusión por parte de la Gobernadora de un mensaje televisado cuyo propósito era el de **defenderse de unas imputaciones relacionadas a sus ejecutorias como candidata a la gobernación** por el Partido Popular Democrático (en adelante P.P.D.) y sobre unos **alegados manejos ilegales de lideres del P.P.D. durante la campaña electoral del año 2000.** La acción presentada por el P.N.P. perseguía que el Tribunal de Primera Instancia ordenara a la Gobernadora el **"cese y desista"** de la producción y publicación de los anuncios impugnados, y ordenara, además, al Departamento de Justicia que llevara a cabo gestiones para recobrar el dinero gastado en el diseño, producción y publicación de los anuncios, y del mensaje difundido el 19 de marzo de 2002. La demanda fue

acompañada de una petición de injunction preliminar en contra de la Gobernadora.

Los recursos presentados por el P.N.P. pretendían que el Tribunal de Primera Instancia emitiera una orden de **"cese y desista"** que evitara la utilización de fondos públicos por parte del Gobierno de Puerto Rico en el diseño, producción y publicación del folleto **"Informe al Pueblo de Puerto Rico: A Dos Años de Administración 2001–2002"**; prohibiera el uso de todo anuncio que incluyera el lema **"Puerto Rico hacia el futuro por buen camino, Sila María Calderón, Gobernadora"**; e impidiera el uso de los **colores rojo y amarillo** en los anuncios gubernamentales donde apareciera el nombre de la Gobernadora.

El 1 de abril de 2003 las partes sometieron al Tribunal de Primera Instancia escrito titulado "Moción Sometiendo Acuerdo de Estipulaciones de Hechos" que consistía de cincuenta y una (51) piezas de evidencia y dos estipulaciones de hechos.[5] Estas estipulaciones

---

[5] ESTIPULACIONES DE LAS PARTES

1-47   Anuncios publicados en la prensa del país.

48   Informe al Pueblo de Puerto Rico, que fuese sometido al Tribunal en la Vista de 25 de marzo de 2003.

49   Video Spots Sila 2000 y Anuncios Presente.

50   Anuncios de Código de Orden Público, Horario Extendido y Oficina de Procuradora del Paciente

51   Carta de César Miranda a Nilsa Clas Miranda del 4 de octubre de 2002.

52   Sila M. Calderón es candidata a reelección al puesto de Gobernadora del Estado Libre Asociado de Puerto Rico

incluyeron, entre otros, 19 anuncios distintos publicados en los periódicos "El Todo", "El Nuevo Día", "Primera Hora" y "The San Juan Star", algunos de los cuales se publicaran en más de una ocasión.

En la estipulación suscrita entre las partes se acordó que las partes podrían presentar evidencia adicional sujeto al requisito de que la misma viniera acompañada o suscrita con una declaración jurada o bajo juramento. La estipulación fue aprobada por el Tribunal de Primera Instancia. A tenor con la referida estipulación se presentó como evidencia por la parte demandante ante el foro primario, además, dos declaraciones juradas prestadas por el señor William Rosales Pérez, Secretario General del P.N.P. y por el señor Peter Kenneth Quiñones Feliciano, Secretario de Prensa de ese partido político. El señor Rosales Pérez declaró que durante la campaña de la entonces candidata a la alcaldía de San Juan, desde el 1995, y durante su campaña a la gobernación, la honorable Sila M. Calderón Serra **utilizó como colores distintivos de su campaña el rojo y amarillo en diferentes tonalidades. Utilizó, además, los colores distintivos del P.P.D., el rojo y blanco.** Expresó, que escuchó en programas de radio auspiciados por el P.P.D. en la estación radial la Super Cadena a lideres del P.P.D. como **la señora Carmen Yulín el 26 de marzo de 2003, y al honorable Héctor Ferrer,**

---

53    La parte demandada ha estado transmitiendo en la radio, prensa y televisión de Puerto Rico determinados anuncios, parte de ellos de los cuales se acompañan en estas estipulaciones.

54

**Representante a la Cámara el 2 de abril de 2003**, utilizar la frase parcial o completa a **"Puerto Rico hacia el futuro por buen camino" así como "vamos por buen camino"**. El señor Quiñones Feliciano declaró que el 26 de marzo de 2003 obtuvo a través del internet el archivo digital del periódico El Nuevo Día que contenía unos artículos en los cuales se cita a la Gobernadora utilizando la frase **"El Partido Popular esta sólido y es el único instrumento que tiene Puerto Rico hacia el siglo 21, hacia el futuro"**. Expresó, que las fechas de esos artículos periodísticos eran el 11 de febrero de 1996, el 5 de enero de 1999, el 28 de mayo de 1999 y el 5 de julio de 1999.

El 4 de abril de 2003 la Gobernadora y el Gobierno de Puerto Rico presentaron "Moción de Desestimación y de Sentencia Sumaria". El P.N.P. presentó otro escrito reafirmándose en su petición original. A solicitud de la Gobernadora el Tribunal de Primera Instancia consolidó las peticiones de injunction preliminar y permanente. El 9 de abril de 2003 el honorable Carlos S. Dávila Vélez, Juez Superior dictó una sentencia, archivándose en autos copia de su notificación a las partes ese mismo día, mediante la cual emitió auto de injunction permanente prohibiendo al Gobierno de Puerto Rico la publicación del folleto **"Informe al Pueblo"** con fondos públicos. Ordenó, además, la destrucción del mismo.[6] No obstante, declaró no ha lugar la petición para que se le prohibiera al

---

[6] El texto de dicho Folleto surge del Anejo VI(A) del apéndice del recurso ante nos, págs. 101-111.

Gobierno de Puerto Rico el uso del **lema "Puerto Rico hacia el futuro por buen camino" y el uso de los colores rojo y amarillo en los anuncios y publicaciones que incluyeron el nombre de la Gobernadora** debido a que estos **"no desvirtúan el fin público de los mismos"**. Finalmente desestimó la demanda contra la honorable Sila M. Calderón Serra en su capacidad oficial como Gobernadora y en calidad personal. El Tribunal de Primera Instancia concluyó, **sobre el uso de los colores rojo, blanco y amarillo utilizados en los anuncios y mensajes impugnados** lo siguiente:

> **Surge del *Exhibit* 49 que el P.P.D. usó en sus anuncios de campaña para las elecciones del año 2000 de manera predominante la combinación de colores rojo y blanco, aunque en los mismos se pueden observar personas en actividades político-partidistas con el símbolo del P.P.D. sobre un fondo amarillo y jóvenes con camisas amarillas y rojas. Pero el uso de la combinación rojo y amarillo no es generalizado. Por no haber la parte demandante probado un uso generalizado de la combinación de colores rojo y amarillo y por no ser esta combinación de colores la reconocida por la Comisión Estatal de Elecciones como los colores del P.P.D., resolvemos que la misma no es una político-partidista.**

> **Aunque el tribunal resolviera que la combinación de colores rojo y amarillo es una político-partidista, el uso de la misma es un anuncio del gobierno estatal de manera no predominante no afectaría la validez de la expresión gubernamental. A diferencia de los lemas, símbolos o emblemas político partidistas, los colores no son de uso exclusivo de ningún candidato o partido político.**

> **Por la naturaleza no apropiable de los colores, para que una expresión gubernamental sea constitucionalmente invalidada por su uso, el promovente debe demostrar que la**

**utilización del color político-partidista claramente constituye un subterfugio para conferir una ventaja a un candidato o partido político.**

**Si los tribunales constitucionalmente invalidan los anuncios por el sólo hecho de la utilización de un color en particular, la norma produciría resultados absurdos: los bomberos no podrían bajo una administración perteneciente al P.P.D. publicar una expresión gubernamental utilizando el color rojo; la Gobernadora no podría enviar tarjetas de Navidad con un San Nicolás vestido de rojo o con pascuas rojas.**

La parte demandante no presentó evidencia alguna para establecer que el uso de los colores **rojo y amarillo** en los anuncios claramente constituye un subterfugio para conferir una ventaja a la Gobernadora o su partido político, por lo que no emitimos orden prohibiendo la publicación de los anuncios por razón de los colores utilizados en los mismos. (Énfasis suplido).

Sobre **el lema** utilizado por la Gobernadora y el Gobierno de Puerto Rico en los anuncios y mensajes publicados el Tribunal de Primera Instancia concluyó lo siguiente:

Se alega que el **lema "Puerto Rico hacia el futuro por buen camino"** pretende realzar a la Gobernadora y a su administración perteneciente al P.P.D.

En **P.P.D. v. Gobernador I**, supra, pág. 690, el Tribunal Supremo expresó que cuando el Gobierno, en el ejercicio de su facultad o deber de informar a la ciudadanía, utiliza **lemas** de naturaleza político-partidista, los tribunales están impedidos por la Constitución de reconocerle fin público alguno a dicha expresión gubernamental.

El **lema "Puerto Rico hacia el futuro por buen camino" no es uno político-partidista.** La parte demandante aceptó en corte abierta no tener evidencia para probar que el P.P.D. utilizó el **lema** en alguna campaña. **Tampoco** surge de la evidencia estipulada que este **lema**

haya sido utilizado o que está siendo utilizado por el P.P.D.

**Por no ser el lema "Puerto Rico hacia el futuro por buen camino" uno político-partidista**, el demandante debe demostrar que la expresión gubernamental como un todo, difundida mediante el uso de fondos públicos, claramente constituye un subterfugio para conferir una ventaja a un candidato o a un partido político, o para adelantar sus intereses político-partidistas. No habiendo la parte demandante satisfecho el peso de la prueba, concluimos que su argumento es improcedente. **Cualquier beneficio incidental por la que pueda surgir por la publicación del anuncio, a favor de la Gobernadora o su administración no desvirtúa el fin público de la misma.** (Énfasis suplido).

Sobre el mensaje televisivo de la Gobernadora impugnado, el Tribunal de Primera Instancia concluyó lo siguiente:

El 19 de marzo de 2002 se transmitió un mensaje televisado de la Gobernadora el cual fue pagado por la Oficina Central de Comunicaciones de la Fortaleza. El mensaje fue el siguiente:

*Muy buenas noches. Te agradezco mucho que me recibas en tu hogar junto a tus seres queridos para escuchar mi mensaje*

***Esta noche quiero hablarte de un tema muy importante para ti, para mí y para todo Puerto Rico. Se trata de la integridad pública, de la honestidad en el manejo de los asuntos de gobierno.***

***Durante las elecciones, el compromiso de gobierno limpio fue central en mi mensaje. El cambio que te prometí tenía que ver en gran medida con terminar para siempre el robo de fondos públicos que permitió la pasada administración, y tenía que ver con mi determinación de eliminar la corrupción, viniera de***

*donde viniera y fuera del partido político que fuera.*

*En los últimos días se han hecho y se han publicado expresiones, alegaciones y acusaciones contra mi campaña a la gobernación. Esto quizás ha creado desorientación en ti y en el pueblo puertorriqueño. De hecho, pienso que el propósito ha sido generar confusión y dudas sobre mi credibilidad, para en alguna forma descarrilar los esfuerzos que llevo para eliminar la corrupción de Puerto Rico.*

*Todo esto es muy serio. Por eso, esta noche me estoy dirigiendo a ti. Para darte una explicación de lo más clara posible, sobre estos temas; para asumir la responsabilidad que me corresponde; y para hablarte de frente. Para hablarte con la verdad, como yo la entiendo, y como siempre te he dicho que voy hablar.*

*Los señalamientos que se han hecho son de dos naturalezas. El primero tiene que ver con anuncios que auspiciaron otros candidatos para apoyar el mensaje integrado de cambio. El segundo tiene que ver con conjeturas y especulaciones, de fuentes anónimas y políticas, que han inferido que se usaron fondos municipales en mi campaña.*

*Yo te puedo asegurar que ambos señalamientos son total y absolutamente falsos.*

*Sobre la segunda imputación te quiero hablar primero, porque trata sobre un tema que es sagrado para mí: el uso de fondos gubernamentales y el respeto que le tengo al servicio público. Nunca, se usó ningún fondo municipal, mientas yo fue [sic] Alcaldesa de San Juan, para cubrir ningún gasto político. Y dudo muchísimo que nadie que trabajara para mí, conociendo lo estricta que yo soy, se atreviera*

*utilizar fondos públicos de esta forma.* De hecho, los informes y las gráficas de fuentes anónimas y políticas que salieron publicados en el día de ayer, son incorrectos. **El equipararme a mí o a mi gobierno con actos de personas como Víctor Fajardo, y tantos otros que están siendo señalados, constituyen una difamación y una bajeza.**

**Me siento segura de lo que estoy diciendo, aún así le he pedido al Departamento de Justicia, al Contralor de Puerto Rico y al Blue Ribbon Committee, que constaten que no hubo uso alguno de fondos públicos en mi campaña.**

**En términos del primer tema, lo que se ha estado discutiendo es si otros candidatos podían hacer anuncios integrados al mensaje de cambio en mi candidatura. Nuestra posición es que los mensajes auspiciados por los diferentes candidatos dentro de la estrategia general, cumplieron con la Ley Electoral y que no se excedió el límite de gastos por esa ley.**

**Sin embargo, para que sobre este tema tampoco quede duda alguna, le he solicitado una auditoria completa a la Comisión Estatal de Elecciones. Le he hecho una asignación especial de fondos para este propósito y les he pedido que se atienda este asunto con la mayor rapidez.**

En esta forma soy la primera Gobernadora en abrir voluntariamente los libros de su partido al escrutinio de la Comisión. Al igual que creo que soy la primera Gobernadora en pedirle a Justicia, al Contralor y a otros organismos que entren a examinar sus propias gestiones.

**Querido puertorriqueño y puertorriqueña que me estás escuchando, tú me has visto desde que asumí el cargo de Gobernadora. Me**

*has visto atacar y perseguir la corrupción en las acciones de la pasada administración y también dentro de mi propio partido político. Lo he hecho sin paños tibios y sin titubeos. Y así lo voy a seguir haciendo. Voy a seguir dando esa guerra. La voy a dar hasta el final. Nada me va a desmoralizar, ni me va a amedrentar, ni mucho menos, me va a detener en este propósito. La corrupción no se puede atacar con miedo. Y yo no tengo miedo porque conozco la verdad.*

*Esta noche siento mucha satisfacción de poder hablar contigo de frente y correctamente. Quiero que sientas la tranquilidad al yo reafirmarte tres cosas que para mí son básicas y vitales. Primero, nunca, nunca he utilizado, ni habré de utilizar, fondos públicos para fines políticos o fines privados. Segundo, nunca he aceptado o he permitido que se acepte un donativo a cambio de un contrato. Tercero, jamás me voy a detener en mi ataque frontal a la corrupción mientras yo sea Gobernadora del Estado Libre Asociado de Puerto Rico.*

*Yo vine a darle gobierno limpio a Puerto Rico y me siento firme en la misión que tiene mi administración. Tú me diste tu confianza y puedes estar seguro de que nunca habré de violar esa confianza.*

*Yo te pido tu respaldo moral y tu apoyo en este trabajo que tengo que hacer por Puerto Rico. Pero más que nada, te pido tus oraciones para que Dios me ilumine, Dios me fortalezca y me mantenga recta en el camino que he escogido para servir a mi patria.*

*Muchas gracias y muy buenas noches.* (Énfasis suplido).

Sostiene la parte demandante que se utilizaron indebidamente fondos públicos para la transmisión del mensaje televisado de 19 de marzo de 2002 **debido a que la**

**Gobernadora pretendió defenderse de acusaciones por hechos ocurridos durante la pasada campaña electoral.** No le asiste la razón. **El mensaje televisado tuvo un "fin público" ya que promovió el interés del Gobierno, en consonancia con sus deberes y funciones de velar por el cumplimiento de las leyes y hacer cumplir las mismas. El mensaje no pretendió realzar a un candidato o partido político. Si bien es correcto la Gobernadora se defendió de acusaciones en su contra que minaban su credibilidad y honestidad, hubo una respuesta oficial a éstas al anunciarse unas medidas gubernamentales para atender la situación.** Sólo la Gobernadora y no la presidenta de un partido político, podía informar a la ciudadanía que estaba refiriendo los señalamientos hechos por la oposición ante la consideración de la Comisión Estatal de Elecciones, del Departamento de Justicia y de la Comisión Independiente de Ciudadanos para Evaluar las Transacciones Gubernamentales. (Énfasis suplido).

Inconforme con la determinación del Tribunal de Primera Instancia el 9 de mayo de 2003 el P.N.P. acudió ante el entonces Tribunal de Circuito de Apelaciones mediante recurso de apelación. Señaló como errores cometidos por el foro primario los siguientes:

## SEÑALAMIENTOS DE ERRORES

1. ERRO [SIC] EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA EN DETERMINAR QUE EL MENSAJE TELEVISADO TUVO UN FIN PUBLICO

2. ERRO [SIC] EL HON. TRIBUNAL EN DETERMNAR QUE NO EXISTE EVIDENCIA ALGUNA CONTRA LA HON. SILA M. CALDERON CON LOS HECHOS OBJETO DE ESTE PLEITO, RAZON (SIC) POR LA CUAL NO RESPONDE EN SU CARÁCTER PERSONAL COMO OFICIAL.

3. ERRO [SIC] EL HONORABLE TRIBUNAL AL DECLARAR SIN LUGAR LA PETICIÓN PARA QUE SE PROHIBA AL ESTADO LIBRE ASOCIADO DE PUERTO RICO EL USO "PUERTO RICO HACIA EL FUTURO POR

BUEN CAMINIO, SILA M. CALDERON GOBERNADORA" Y DE TODO USO DE COMBINACIÓN DE COLORES ROJO Y AMARILLO EN LOS AUNCIOS O PUBLICACIONES Y QUE LA COMBINACIÓN DE LOS MISMOS TIENEN UN FIN LEGITIMO PUBLICO.

El 18 de junio de 2003 la Gobernadora de Puerto Rico presentó su alegato como parte apelada ante el foro intermedio apelativo. El 19 de junio de 2003 el Gobierno de Puerto Rico también presentó el suyo. Hasta esa fecha el panel del entonces Tribunal de Circuito de Apelaciones, al que fue asignado el caso, estaba compuesto por la honorable Liana Fiol Matta, Presidenta, y los Jueces de Apelaciones honorables Roberto González Rivera y honorable Carlos Rivera Martínez. El 23 de julio de 2003 compareció la parte apelante, P.N.P. con un escrito titulado "Moción en Oposición a los Alegatos de los Demandados". El 30 de julio de 2003 la Gobernadora presentó escrito titulado "Replica a Moción en Oposición a Alegato de los Demandados". En esa fecha quedó sometido el recurso para su disposición final.

El 12 de agosto de 2003 el honorable Roberto González Rivera, Juez de Apelaciones, emitió Resolución inhibiéndose de participar en el caso. Dicha Resolución reza de la forma siguiente:

RESOLUCIÓN

En San Juan, Puerto Rico a 12 de agosto de 2003.

Me he percatado en esta etapa de los procedimientos que en el presente caso tengo ideas preconcebidas y conocimiento extrajudicial de estos hechos. En beneficio de las partes y para evitar cualquier apariencia

de prejuicio o parcialidad personal, he decido
[sic] inhibirme de participar en el mismo.

Notifíquese a las partes inmediatamente.

Roberto González Rivera
Juez de Apelaciones

Dicha Resolución fue notificada a las partes el 14 de agosto de 2003. El 11 de agosto de 2003 la honorable Dolores Rodríguez de Oronoz, Jueza Administradora del entonces Tribunal de Circuito de Apelaciones dictó la orden administrativa, núm. TCA-2003-117 sustituyendo al honorable Roberto González Rivera con la honorable Zadette Bajandas Vélez en el referido panel.[7]

El 3 de diciembre de 2003 la honorable Liana Fiol Matta, Presidenta del panel que tenía asignado el caso de autos emitió Resolución inhibiéndose de participar en el caso. Dicha Resolución reza de la forma siguiente:

RESOLUCION

En San Juan, Puerto Rico, a 3 de diciembre
de 2003.

A tenor con la Regla 63.1b) de
Procedimiento Civil, 32 LPRA, Ap. III, esta
magistrada se inhibe "motu proprio" de
entender en el presente caso, en aras de
mantener la pureza de los procedimientos, ya
que después de asignado el recurso, ha llegado
a la atención de la suscribiente que un
familiar cercano podría tener conocimiento de
hechos relacionados a la controversia aquí
planteada.

---

[7] Resulta extraño que la referida Orden Administrativa refleje una fecha anterior a la Resolución mediante la cual el Juez de Apelaciones, señor González Rivera se inhibió.

Se ordena que el presente recurso sea llevado ante la consideración de la Jueza Administradora para que ésta proceda a efectuar la designación correspondiente.(Énfasis suplido).

Notifíquese.

Liana Fiol Matta
Jueza de Apelaciones

El 5 de diciembre de 2003 la honorable Dolores Rodríguez de Oronoz, Jueza Administradora del Tribunal de Apelaciones dictó la orden administrativa núm. TA-2003-006 sustituyendo a la honorable Liana Fiol Matta con la honorable Dora T. Peñagaricano Soler en el referido panel. La Resolución emitida por la honorable Liana Fiol Matta y la referida Orden Administrativa fue notificada a las partes el 14 de enero de 2004.

El 19 de diciembre de 2003 el panel del Tribunal de Apelaciones compuesto por su presidente honorable Carlos Rivera Martínez, Juez Ponente, y las Juezas de Apelaciones honorable Zadette Bajandas y honorable Dora Peñagaricano Soler dictó sentencia confirmando la sentencia apelada, archivándose en autos copia de su notificación a las partes el 23 de diciembre de 2003 [8].

La parte demandante de autos, apelante ante el Tribunal de Apelaciones acudió oportunamente ante nos.

---

[8]  Resulta extraño el que se haya archivado en autos copia de la notificación a las partes de la sentencia del Tribunal de Apelaciones el 23 de diciembre de 2003 y la notificación a las partes de la Resolución de inhibición emitida el 3 de diciembre de 2003 por la honorable Liana Fiol Matta, presidenta del panel se haya producido el 14 de enero de 2004.

Señaló como errores cometidos por ese tribunal los siguientes:

ERRÓ EL HONORABLE TRIBUNAL DE APELACIONES AL CONFIRMAR LA DETERMINACIÓN DEL TRIBUNAL DE PRIMERA INSTANCIA DE NO PROHIBIR EL LEMA" PUERTO RICO HACIA EL FUTURO POR BUEN CAMINO" Y LA COMBINACIÓN DE COLORES ROJO Y AMARILLO EN LOS ANUNCIOS PUBLICADOS POR EL ESTADO LIBRE ASOCIADO DE PUERTO RICO.

ERRÓ EL TRIBUNAL DE APELACIONES AL CONFIRMAR LA DETERMINACIÓN DEL TRIBUNAL DE PRIMERA INSTANCIA, CON RESPECTO AL [sic] DETERMINAR QUE EL MENSAJE TELEVISADO DE LA GOBERNADORA DEL DÍA 19 DE MARZO DE 2002 TENÍA UN FIN PÚBLICO Y NO SE TRANSMITIÓ EN VIOLACIÓN A LAS DISPOSICIONES DE LEY Y LOS PRECEPTOS CONSTITUCIONALES.

ERRÓ EL TRIBUNAL DE APELACIONES AL COMFIRMAR LA DETERMINACIÓN DEL TRIBUNAL DE PRIMERA INSTANCIA DE QUE LA HON. SILA M. CALDERON NO RESPONDE TANTO EN SU CARÁCTER PERSONAL Y OFICIAL COMO GOBERNADORA, POR LOS HECHOS OBJETO DE LA DEMANDA.

II

Doctrina de Academicidad

En **Emp. Pur. Des., Inc. v. H.I.E.TEL**, supra, expresamos lo siguiente:

En pronunciamientos previos hemos indicado que un caso se torna académico cuando su condición de controversia viva y presente sucumbe ante el paso del tiempo. **P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995); Asoc. de Periodistas v. González, 127 D.P.R. 704 (1991); Noriega v. Gobernador, 122 D.P.R. 650 (1988); El Vocero v. Junta de Planificación, 121 D.P.R. 115 (1988).**

Los tribunales pierden su jurisdicción sobre un caso por

academicidad cuando ocurren cambios durante el trámite judicial de una controversia particular que hacen que ésta pierda su actualidad, de modo que el remedio que pueda dictar el tribunal no ha de llegar a tener efecto real alguno en cuanto a esa controversia. Con esta limitación sobre el poder de los tribunales, se persigue evitar el uso innecesario de los recursos judiciales y obviar pronunciamientos autoritativos de los tribunales que resulten superfluos. **C.E.E. v. Depto. de Estado**, **134 D.P.R. 927,935-936 (1993); Com. de la Mujer v. Srio. de Justicia, 109 D.P.R. 715, 724-725 (1980).**

Ahora bien, existen situaciones especiales en las cuales los tribunales pueden atender un caso que se ha tornado académico. Es decir, hemos reconocido antes que existen varias excepciones a la doctrina de academicidad. Una de ellas es cuando en un caso se plantea una *cuestión recurrente*; es decir, susceptible de volver a ocurrir pero que, por la naturaleza efímera de los hechos que provocan la cuestión, es difícil que logre ser dilucidada por los tribunales. *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994); *C.E.E. v. Depto. de Estado,* supra; *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988); *Asoc. de Periodistas v. González*, supra; *Com. de la Mujer v. Srio de Justicia*, supra.

En el caso de autos, las manifestaciones específicas que dieron lugar al recurso ante nos han cesado ya, por lo que podría estimarse que la controversia concreta que nos concierne aquí sobre el *injunction* preliminar se ha tornado académica. No obstante, es evidente que la cuestión novel e importante que este pleito presenta, de si agrupaciones como las peticionarias puedan llevar a cabo manifestaciones como las del caso de autos en un centro comercial privado, cuando sus dueños se oponen a tales actos, es una que con razonable probabilidad *ha de surgir de nuevo*. El acto de expresión pública impugnado puede volver a concluir antes de que la cuestión referida haya sido dilucidada judicialmente en

los méritos. *Tal como ha sucedido en el caso de autos, la controversia aludida entre los manifestantes y el centro comercial puede presentarse otra vez y la situación concreta que la ocasiona puede volver a desaparecer mientras el caso es examinado por los tribunales. En tales circunstancias, si no pasamos juicio sobre la controversia referida aunque haya terminado la manifestación, quedaría conculcada así nuestra función revisora.*

En efecto, el importante asunto que tenemos planteado en el caso de autos, ha estado ya antes ante los tribunales del país sin que se haya podido resolver en sus méritos. En el caso anterior referido se intentó impedir otras manifestaciones realizadas precisamente en los predios del centro comercial Mayagüez Mall. Al igual que como ocurrió en el caso ante nos ahora, Empresas había alquilado un local a la Autoridad de Energía Eléctrica (en adelante la A.E.E.) para la operación de una oficina comercial de servicio al público. El 30 de marzo de 1995, a raíz de una disputa obrero-patronal, empleados de la A.E.E. pertenecientes a la Unión de Trabajadores de la Industria Eléctrica y Riego de Puerto Rico (en adelante la U.T.I.E.R.) realizaron manifestaciones de protesta contra la A.E.E. dentro del Mayagüez Mall. Como consecuencia de ello, el día siguiente, Empresas presentó una acción ante el Tribunal de Primera Instancia, Sala Superior de Mayagüez, y solicitó que se emitiese un entredicho provisional, así como un interdicto preliminar y uno permanente. Luego de la concesión del entredicho provisional y de varios trámites apelativos, el foro de instancia resolvió que la acción de Empresas se había tornado académica en vista de que las manifestaciones de la U.T.I.E.R. había terminado para el tiempo en que el tribunal se disponía a dilucidar el caso. Por ende, desestimó la acción de Empresas, sin resolver la importante controversia constitucional que se le había planteado. El Tribunal de Circuito de Apelaciones confirmó dicho dictamen. No cabe dudas, pues, que tenemos ante nos una clara situación de una *controversia recurrente*, que es una de las excepciones bien conocidas a la doctrina de la cuestión académica. Resolvemos, pues, que tenemos jurisdicción para dilucidar el importante asunto ante nos.

**Debe quedar claro que ésta no es la primera vez que consideramos la validez de los actos de protesta *después* que dichos actos han cesado definitivamente. En *E.L.A. v. Rivera Rivera*, 105 D.P.R. 640 (1977), un grupo de personas montaron un piquete de protesta en las inmediaciones de la Fortaleza, la residencia oficial del Gobernador de Puerto Rico. El Tribunal Superior, a instancias del Estado, expidió un *injunction* que si bien salvaguardaba el derecho a la libre expresión de los manifestantes aludidos, limitaba a la vez las horas del día en las que se podían celebrar los actos de protesta y fijaba otras restricciones afines. Los manifestantes apelaron de inmediato ante nos, cuestionando las limitaciones impuestas mediante el *injunction* referido. Inicialmente rehusamos suspender el *injunction* pendiente la apelación. *Posteriormente, año y medio después de haber terminado los actos de protesta en cuestión, ejercimos nuestra jurisdicción y adjudicamos la validez del "injunction" referido. Igual hicimos con respecto a un injunction preliminar y permanente que había sido procurado en relación con un piquete, luego de éste haber concluido en E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975). Procede, pues, que en el caso de autos actuemos del mismo modo.** (Énfasis suplido)

El Juez Asociado señor Corrada del Río disintió por entender que esa controversia se había tornado académica. No obstante, concurrió con el resultado por fundamentos que no coincidían completamente con los esbozados en la opinión mayoritaria. Expresó, que la aplicación de la excepción a la doctrina de academicidad se da en la situación en que hay una "expectativa razonable" o una "probabilidad demostrable" de que la misma controversia recurrirá involucrando a la misma parte promovente. Concluyó, que en ese caso no existía ninguna controversia entre las partes para resolver, y de que este Tribunal no se encontraba ante una de las excepciones a la aplicación

de la doctrina de academicidad. Expresó, que el asunto a revisar por este Tribunal, o sea el injunction preliminar emitido por el entonces Tribunal de Circuito de Apelaciones, se tornó académico toda vez que los hechos que dieron lugar a dicha solicitud cesaron. La protesta realizada en los predios del Mayagüez Mall tenía el propósito de evitar la venta de acciones de la Puerto Rico Telephone Company (PRTC) a la empresa privada, la cual ya había sido llevada a cabo. La intención de la empresa que opera el Mayagüez Mall era evitar que los manifestantes realizaran su protesta dentro de los predios de su propiedad. Tal propósito ya no estaba presente, pues la referida venta de acciones era una realidad indiscutible y tal empresa había obtenido el remedio que perseguía con el injunction preliminar a los efectos que los manifestantes salieran de los predios de su propiedad inmueble. Concluyó, además, que la empresa no demostró la "probabilidad o expectativa razonable" de que el asunto o la situación que dio lugar a esa controversia se repitiera nuevamente y, que de recurrir, evadiera la revisión judicial.[9]

En **P.P.D. v. Gobernador I**,[10] expresamos, sobre el tema de academicidad, lo siguiente:

> En diversas ocasiones hemos considerado la doctrina de academicidad. Un caso

---

[9] Para el momento que se atendió este asunto por esta Curia no sólo había concluido la manifestación pública sino que la Puerto Rico Telephone Company (PRTC) ya no era arrendataria de la empresa promovente.

[10] Supra, págs. 675-678.

académico es " uno en que  se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un  derecho antes de que este haya sido reclamado, o una  sentencia sobre un asunto, que al dictarse, por alguna razón  no podrá tener efectos prácticos sobre una controversia existente...". *E.L.A. v. Aguayo*, 80 D.P.R. 552, 584 (1958). **Véase** *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993).

**Una controversia puede convertirse en académica  cuando los cambios fácticos o judiciales acaecidos  durante el trámite judicial tornan en ficticia su solución, para convertirse así en una opinión consultiva sobre asuntos abstractos de derecho.** *Pueblo en interés  menor M.A.G.O.*, 138 D.P.R. 20 (1995); *El Vocero v. Junta de Planificación*, 121 D.P.R.  115 (1988); *Noriega v. Hernández Colón*, **supra; entre otros.**

**En** *Asoc. de Periodistas v. González*, **127 D.P.R.  704, 717-718 (1991**), explicamos que "[a]l considerar el concepto de `academicidad´ hay que concentrarse en la relación existente entre los eventos pasados que dieron inicio al pleito y la adversidad presente.  Este análisis es vital para determinar la existencia de los requisitos constitucionales (`caso o controversiá) o jurisprudenciales de justiciabilidad.  Un caso se convierte en académico cuando con el paso del tiempo su condición de controversia viva y presente se pierde". (Escolio omitido).

**Se han elaborado, sin embargo, una serie de excepciones a la doctrina de academicidad que permiten la consideración de un caso que de otro modo resultaría académico en cuanto a su resultado o efecto inmediato.** *Por ejemplo, "cuando el caso ante el  tribunal presenta una cuestión recurrente o susceptible  de volver a ocurrir (capable of repetition),* Roe v. Wade, **410 U.S.  113 (1973);** *Moore v. Ogilvie*, **394 U.S. 814, 816 (1969);** *So. Pac. Terminal Col v. Int. Comm. Comm.*, **219 U.S.  498, 515 (1911); o cuando aspectos de la controversia se tornan académicos pero persisten consecuencias colaterales de ésta que tienen vigencia y**

actualidad. Véanse: *R. Serrano Geyls, Derecho Constitucional de Estados Unidos y Puerto Rico,* San Juan, Ed. C. Abo. P.R., 1986, Vol. 1, 1986, págs. 122-126; L.H.Tribe, *American Constitutional Law*, 2da. Ed., Nueva York, Ed. Foundation Press, 1988; *El Vocero v. Junta de Planificación*, supra, págs. 124-126". *C.E.E. v. Depto. de Estado*, supra, pág. 936.

En C*.E.E. v. Depto. de Estado*, supra, pág. 936, resolvimos que, "es evidente que la conflictiva cuestión de derecho que dio lugar a la disputa entre las partes de este caso es *susceptible de volver a ocurrir*". (Énfasis suplido). Señalamos que "con marcada frecuencia las agencias y los departamentos gubernamentales se ven en la necesidad de anunciar al país los eventos públicos que habrán de celebrar aun en años electorales y la postura de la Comisión, si no se dilucida de manera determinante, es *potencialmente una fuente de continuos conflictos*". (Énfasis suplido). Id., págs. 936-937. Allí también consideramos que por tratarse de anuncios, al igual que en los presentes casos, "si la controversia ante nos ahora no se resuelve finalmente [por este Tribunal], la parte que promueve la limitación a los anuncios en cuestión... tendrá que volver a los tribunales en el futuro con su planteamiento, litigándolo siempre a última hora, debido a que es un asunto que por su naturaleza tiende a surgir imprevistamente, haciendo muy difícil que sea revisado judicialmente de manera definitiva". Id., pág. 937.

Aplicando los principios de la doctrina de academicidad, debemos concluir que por la naturaleza de la controversia de estos casos, o sea, el uso de fondos públicos para sufragar anuncios de índole político-partidista, ésta es susceptible de repetirse, aun cuando en el caso *P.P.D. v. Rosselló*, Caso Civil Núm. AP-95-7, el anuncio ya no se publica. Así lo reconoce el señor Procurador General en su alegato. Igual razonamiento es aplicable al caso *P.P.D. v. P.N.P.*, Caso Civil Núm. CT-95-10.

De otra parte, dado que en el caso Pérez *Preston v. Aponte*, Caso Civil Núm. AP-95-9, la acción fue desestimada en forma sumaria

**por el tribunal, a este momento se continua la publicación del logo impugnado, por lo que la controversia que dio origen continua viva en toda su extensión.**

**Por las razones antes indicadas, concluimos que ninguno de los tres (3) casos se ha tornado académico.** (Énfasis suplido).

El Juez Asociado señor Hernández Denton en su opinión de conformidad[11] expresó "...nunca antes habíamos tenido ante nuestra consideración una controversia análoga. Aunque en cuatrienios anteriores otros incumbentes también habían utilizado los medios de comunicación comerciales para anunciar sus logros, esta es la primera vez que unos partidos de oposición, tanto a nivel municipal como en el central, cuestionan este tipo de campaña gubernamental multimillonaria durante el periodo preelectoral".

Añadió,[12] que "... la opinión del Tribunal evita que el partido de turno que está en el poder, tanto en el gobierno central como en los municipales, comience el año de elecciones con una ventaja indebida frente a los otros partidos principales mediante la utilización de fondos públicos en una campaña publicitaria que tiene un propósito político partidista. La Sec. 9 del Artículo VI de nuestra Constitución, *supra* no permite el uso de fondos públicos con esos propósitos".

---

[11] Id., pág. 755.

[12] Id., págs. 755-756

El Juez Asociado señor Fuster Berlingeri en su opinión conformidad[13] realizó expresiones que resultan pertinentes a este tema. Expresó lo siguiente:

> ...en vista de que los casos ante nos presentan en común un **importantísimo problema de la colectividad que amerita resolverse urgentemente, para colegiar, he emitido un voto de conformidad.** Me pareció necesario, sin embargo, expresar unos criterios adicionales, formulados en esta opinión particular, para hacer hincapié en lo rigurosas que son las limitaciones sobre anuncios oficiales que surgen del principio de igualdad inmerso en nuestra Constitución. **He formulado estos criterios adicionales confiado en que, con ellos, en alguna oportunidad futura, de mayor serenidad, podamos fortalecer aún más la democracia puertorriqueña.** (Énfasis suplido).

El Juez Asociado señor Corrada del Río en su opinión concurrente y disidente,[14] sobre el tema de academicidad, expresó lo siguiente:

> La cuestión de academicidad no requiere ser discutida extensamente, ya que surge de la naturaleza de las alegaciones, de las determinaciones de hecho del tribunal de instancia y de los alegatos de las partes que dicha doctrina no es aplicable a los casos de autos, como concluye la opinión mayoritaria.
>
> Basta con señalar que a la luz de los criterios que establecimos en *Com. de la Mujer v. Srio. de Justicia*, **109 D.P.R. 715 (1980), así como en El Vocero v. Junta de Planificación , 121 D.P.R. 115 (1988); Noriega v. Gobernador, 122 D.P.R. 650 (1988), y Noriega v. Hernández Colón, supra,** estos casos no son académicos. (Énfasis suplido).

En **P.P.D. v. Gobernador II**,[15] el entonces Juez Asociado de este Tribunal señor Negrón García expresó en

---

[13] Id., pags. 797-798

[14] Id., pág. 835

su opinión concurrente relacionado con el referido tema,

lo siguiente:

> Reafirmamos que "*[l]os fondos del erario son sagrados lo manda la Constitución y legislación*. Así lo entendieron muchos buenos servidores, que décadas atrás nos precedieron en la administración de la cosa pública. Lamentablemente, en los últimos cuatrienios, la recta y sana administración pública ha sido totalmente confundida con el manejo de lo sectario partidista. *Como correctamente concluyó el ilustrado tribunal de instancia (Hon. Arnaldo López Rodríguez, Juez), este mal proceder ha trascendido en las distintas administraciones, ha hecho crisis en los últimos cuatrienios, controlados por El P.N.P. y P.P.D.; incluso dentro de la administración municipal. Ya para el 1990, en Noriega v. Hernández Colón,* [resuelto el 6 de abril de 1992], habíamos cuestionado esta práctica perjudicial. Dijimos: "...¿quién le pondrá freno a esa disputa y saturación de anuncios `públicos´?, ¿quién controlará la sangría presupuestaria? Esta aterradora visión del futuro, ¿no es más bien típica de una campaña electoral entre partidos de oposición en año eleccionario? *¿Por qué trasladarla al escenario gubernamental y gravar los fondos públicos al amparo de la cuestionable práctica de `informar´ al pueblo?* Recapitulando, este tipo de campaña, impulsada para ganarse la opinión pública, abre camino a una contienda político-ideológica de mayor envergadura".

Añadió,[16] lo siguiente:

> **Nuestra decisión simplemente rescató y aplicó unos preceptos constitucionales vigentes desde 1952. Éstos sostienen la ilegalidad de los desembolsos de fondos públicos para financiar unas campañas publicitarias político-partidistas, en interacción con el principio igualitario en materia de financiamiento electoral expuesto prístinamente en** *Marrero v. Mun. de Morovis,* **115 D.P.R. 643, 646 (1984),;** *P.R.P. v. E.L.A.,* **115 D.P.R. 631, 640 (1984), y** *P.P.D. v. Gobernador II,* **136 D.P.R. 916 (1994).**

---

[15] Supra, págs. 986-987, 989.

[16] Id., pág. 989.

> No estamos, pues, ante una decisión o una nueva regla jurisprudencial que permita invocar y justificar sólo su prospectividad. Sería un contransentido, por no decir una burla, que con estos claros precedentes judiciales le negáramos los efectos retroactivos. Significaría admitir que el Poder Judicial ha incurrido en un ejercicio académico y vacuo al proclamar la vigencia de una Constitución abstracta e inoperante.(Énfasis suplido)

Hemos expresado en forma reiterada que al evaluar la procedencia de un *injunction* preliminar examinaremos los criterios siguientes: (1) la naturaleza de los daños que puedan ocasionarse a las partes de concederse o denegarse el injunction, (2)**la irreparabilidad del daño o la existencia de un remedio adecuado en ley,** (3) la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo; (4) **la probabilidad de que la causa se torne académica de no concederse el injunction y, sobre todo,** (5) el posible impacto sobre el interés público del remedio que se solicita.[17]

El propósito fundamental del injunction preliminar surge de la razón de ser del cuarto criterio a ser considerado para conceder el remedio solicitado. Este es, mantener el status quo hasta que se celebre el juicio en sus méritos para que así no se produzca una situación que convierta en académica la sentencia que finalmente

---

[17] **Misión Ind. P.R. v. J. P. y A.A.A.**, 142 D.P.R. 656 (1997); **Mun. de Ponce v. Gobernador**, 136 D.P.R. 776 (1994); **García v. World Wide Entmt. Co.**, 132 D.P.R. 378 (1992); **Cobos Liccia v. DeJean Packing Co., Inc.** 124 D.P.R. 896 (1989), **Systema de P.R. , Inc. v. Interface Int'l**. 123 D.P.R. 379 (1989).

se dicte al atender la petición de injunction permanente, o se le ocasionen daños de mayor consideración al peticionario mientras perdura el litigio. [18] No obstante, el criterio en torno a la academicidad de tal causa de acción está, además, estrechamente relacionado con el segundo criterio, la irreparabilidad de los daños o la existencia de un remedio adecuado en ley. [19]

La parte demandante de autos, aquí peticionaria, alegó ante el Tribunal de Primera Instancia, específicamente en los apartados once (11), doce (12), diecinueve (19) y la súplica de su demanda lo siguiente:

11. La Sección 9 del Artículo VI de la Constitución del Estado Libre Asociado de Puerto Rico establece que:

"Sólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley".

**12. De conformidad con el precepto constitucional citado, el Tribunal Supremo de Puerto Rico ha resuelto que "[e]n la medida en que los fondos públicos se utilicen para propaganda político-partidista se está afectando detrimentalmente el derecho de los demás electores". Marrero v. Mun. de Morovis, 115 D.P.R. 643, 645 (1984). En P.P.D. v. Roselló González, _supra_, el Tribunal Supremo de Puerto Rico analizó el caso de Marrero v. Mun. de Morovis, _supra_, reafirmó la norma de que"...bajo la restricción constitucional al uso de los fondos públicos, no se permite el uso político-partidista de dichos fondos ni que de otro modo un partido político o candidato obtenga una ventaja económica a expensas del erario público".**

---

[18] **Misión Ind. P.R. v. J.P y A.A.A.**, supra.

[19] **Id.; Mun. de Ponce v. Gobernador** ; supra.

**19. De los demandados seguir su propuesto curso de acción, tanto los demandantes -en función del principio de igualdad económica electoral reconocido por el Tribunal Supremo de Puerto Rico—-como el Pueblo de Puerto Rico, continuaran sufriendo daños de naturaleza irreparable que no podrán ser compensados, aún con una orden de restitución de los dineros invertidos en la campaña ilegal pagada con fondos públicos.**

POR TODO LO CUAL y en mérito de lo antes expuesto muy respetuosamente se solicita de este Honorable Tribunal que declare con lugar esta solicitud y en su consecuencia emita una sentencia declarando **(1) inconstitucional el gasto de fondos públicos por los demandados en anuncios sin fin ni utilidad públicos; (2) un injunction que ordene a los demandados abstenerse de continuar utilizando fondos públicos en el diseño, producción y publicación de tales anuncios, y (3) una Orden al Departamento de Justicia para que proceda con el recobro y restitución al erario de todo el dinero gastado en el diseño, producción y publicación de tales anuncios, por parte de los funcionarios del Estado Libre Asociado que incurrieron en tal acción inconstitucional, y cualquier otro remedio, a favor de la parte demandante, que en derecho proceda.** (Énfasis suplido).

La parte apelante ante el tribunal intermedio apelativo, aquí peticionaria, alegó ante ese foro que ocho (8) años después de la histórica decisión de este Tribunal en **P.P.D. v Gobernador I**, *supra,* la honorable Sila M. Calderón Serra, Gobernadora de Puerto Rico armada con **"el mayor tesoro de campaña- el erario público- intenta dominar un proceso democrático (sic) y comienza, en perjuicio de las minorías políticas u oposición,** a **utilizar fondos públicos para adelantar sus intereses político privados"**. El P.N.P., parte apelante ante el Tribunal de Apelaciones y aquí peticionario, planteó ante

ese foro que la Gobernadora de Puerto Rico, en una clara violación a lo dispuesto por este tribunal el **P.P.D. v. Gobernador I,** *supra*, faltó a su deber ministerial y ordenó la publicación y diseminación del folleto **"Informe al Pueblo de Puerto Rico:  A dos años de Administración 2001-2002, Sila M. Calderón, Gobernadora  Estado Libre Asociado".**  Alegó que luego comenzaron a publicar anuncios en la televisión, radio y prensa escrita **predominando los colores rojo y amarillo** y el  **lema "Puerto Rico hacia el futuro por Buen Camino" Sila M. Calderón Gobernadora  Estado Libre Asociado".**  Arguyó que la Gobernadora utilizó fondos públicos para diseminar un mensaje a través de la Oficina de Comunicaciones de la Fortaleza **para defenderse de acusaciones políticas que le dirigieran sus adversarios políticos sobre la forma que financió su campaña política frente a las elecciones generales del año 2000.  Puntualizó que sobre este último asunto la Oficina del Contralor concluyó que dicho anuncio fue uno de naturaleza política, sin función pública alguna y que el pago del mismo con fondos públicos era ilegal.** Expuso que  la parte apelada ante el Tribunal de Apelaciones, aquí recurrida, infringió la sección 9 del Artículo VI, de la Constitución de Puerto Rico la cual consagra el principio de igualdad o paridad económica entre los partidos políticos, al utilizar o permitir el uso de fondos públicos para la promoción de determinada postura política.

En **P.P.D. v. Gobernador I**,[20] expresamos lo siguiente:

> En nuestra jurisdicción hemos reconocido que son susceptibles de impugnación constitucional las actuaciones que hacen onerosa o afectan negativa y sustancialmente el potencial de los partidos contrarios minoritarios o nuevos, así como cuando se crean situaciones que los colocan en una posición de inferioridad. Refiérase a *P.R.P. v. E.L.A.*, *supra*, pág. 638.
>
> **El axioma constitucional de igualdad electoral ha sido objeto de protección no sólo en nuestra jurisprudencia, sino por el propio legislador en el diseño del esquema electoral de nuestro país. De ahí que los partidos políticos reciben un trato igual en la asignación anual de fondos públicos para su funcionamiento. Refiérase al Art. 3.023 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3116, recientemente enmendado.[21]**

---

[20] Supra, págs. 667-669.

[21] El Art. 3.023 de la Ley Electoral de Puerto Rico, Ley Núm. 4 de 20 de diciembre de 1977, según enmendado por la Ley Núm. 169 de 11 de agosto de 1995 (16 L.P.R.A. sec. 3116), dispone lo siguiente:

**"En años que no sean de elecciones generales cada partido político principal o partido por petición que haya cumplido o satisfecho el procedimiento establecido en la sección que antecede, podrá girar anualmente contra el Fondo Electoral por una cantidad que no se excederá de trescientos mil (300,000) dólares. En años de elecciones generales, los partidos políticos podrán girar contra los remanentes que hayan sobrado en años anteriores, pero el derecho de acumular tales remanentes solo operará desde el año en que el partido se haya acogido a los beneficios aquí dispuestos.**

**"En año de elecciones generales cada partido político en unión a su candidato a Gobernador con derecho a los beneficios del Fondo Electoral tendrá derecho, con cargo al mismo, a una cantidad que no excederá de la suma de seiscientos mil (600,000) dólares."**

**Cabe señalar que mediante esta ley también se enmendaron los Arts. 3.032 y 3.027 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. secs. 3124 y 3119, para aumentar el crédito adicional para los partidos políticos y el crédito para la transportación de electores. Con la aprobación de la Ley Núm. 168 de 11 de agosto de 1995 (16 L.P.R.A. sec. 3110) se enmendó, a su vez, el Art. 3.016**

Con la aprobación de la Ley Núm. 169 de 11 de agosto de 1995 (16 L.P.R.A. secs. 3116, 3117 y 3119) se enmendaron, entre otros, el referido Art. 3.023 de la Ley Electoral de Puerto Rico a los fines de aumentar la participación de los partidos en el Fondo Electoral. En su exposición de motivos esta ley explica claramente el propósito del Fondo Electoral, al disponer que:

> *Dichos fondos se distribuyen conforme a los costos funcionales de los partidos, tanto en años electorales como en los no electorales. El fondo electoral permite a los partidos políticos, debidamente inscritos, financiar sus operaciones ordinarias. ...*

> *La presente medida permite la subsistencia de los partidos al costear parte de sus actividades electorales salvaguardándolos de una dependencia económica externa al interés gubernamental y social que debe guiar la existencia de los partidos. (Énfasis suplido). (Cita omitida).*

**Considerando nuestro esquema electoral, resulta innegable que a través de éste se considere la existencia continua de los partidos políticos y su participación en la discusión de los asuntos de interés público no sólo durante el año eleccionario, sino durante *todo el cuatrienio*. Ello resulta compatible con el papel desempeñado por los partidos políticos en la moderna sociedad puertorriqueña. Los partidos políticos "[c]onstituyen el vehículo de expresión colectiva ciudadana para canalizar pacíficamente las distintas tendencias políticas e intereses de los varios sectores de opinión del país". *P.R.P. v E.L.A.,* supra, pág. 638. En *P.S.P. v. E.L.A.*, 107 D.P.R. 590, 610 (1978), resumimos el ámbito de participación y el rol de los partidos políticos en la sociedad contemporánea de la forma siguiente:**

---

**de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3110, para aumentar el límite legal del gasto en año eleccionario para la compra de espacio y tiempo en los medios de difusión a dos millones doscientos cincuenta mil (2,250,000) dólares.** (Énfasis suplido).

> Los partidos políticos son elemento básico de toda democracia. C.J. Friedrich, *Constitutional Government and Democracy 4a. ed.*, 1968, pág. 430 y ss. Son las vías mediante las cuales se canalizan pacíficamente las distintas tendencias políticas y económicas de la sociedad en un momento dado. *Fuster v. Busó*, 102 D.P.R. 327, 347 (1974) y autoridades allí citadas. R. Young, *American Law and Politics*, ed. 1967, pág.67; V.O. Key, *Politics, Parties, and Pressure Groups*, 5a ed., 1964, pág. 200. Los partidos políticos realizan funciones cuasigubernamentales, tales como formular programas de administración y proponer candidatos a puestos políticos. El desempeño de estas funciones es indispensable para el sistema político. Note, *Primary Elections: The Real Party in Interest*, 27 Rutgers L. Rev. 298, 303 (1974).(Énfasis suplido).

El Artículo 8.001 de la ley Electoral de Puerto Rico[22], según enmendada, dispone lo siguiente:

> Se prohíbe a las agencias del Gobierno de Puerto Rico, la Asamblea Legislativa de Puerto Rico y a la Rama Judicial, que a partir del 1ro de enero del año en que deba celebrarse una elección general y hasta el día siguiente a la fecha de celebración de la misma, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. Se exceptúan de esta disposición aquellos avisos y anuncios de prensa expresamente requeridos por ley.

> Asimismo, se exceptúan de la anterior disposición aquellos anuncios que sean utilizados para difundir información de interés publico, urgencia o emergencia, los cuales sólo serán permitidos previa autorización al efecto de la Comisión Estatal de Elecciones. (Énfafis suplido).

---

[22] 16 L.P.R.A. sec. 3351.

El recurso de apelación presentado el 9 de mayo de 2003 ante el Tribunal de Apelaciones por la parte aquí peticionaria, perfeccionado y sometido el 30 de julio de 2003 para disposición final fue resuelto en forma definitiva por ese foro apelativo el 19 de diciembre de 2003. De la Resolución emitida el 3 de diciembre de 2003 por la honorable Liana Fiol Matta, entonces Juez de Apelaciones y Presidenta del Panel al que estaba sometido este asunto, inhibiéndose de continuar participando en el mismo se desprende que después de asignado el recurso al Juez Ponente, para redactar su ponencia como sentencia se percató de las razones que la movían a inhibirse. Fue sustituida en su panel por el honorable Carlos Rivera Martínez quien fungió como Presidente del Panel y Juez Ponente de la sentencia dictada y recurrida ante este foro. Se archivó en autos copia de la notificación a las partes de la sentencia dictada por el Tribunal de Apelaciones el 23 de diciembre de 2003. El día 24 de diciembre de 2003 por la noche se celebró Navidad. El día 25 de diciembre de 2003 era feriado. La parte aquí peticionaria sólo tuvo disponible, antes de que concluyera el periodo preelectoral, partiendo de la premisa que recibió copia de la sentencia el 24 de diciembre de 2003, el viernes 26, **el sábado 27, el domingo 28**, el lunes 29, el martes 30, y el miércoles 31, del mes de diciembre de 2003 para preparar un escrito solicitando un remedio sobre la referida sentencia a ese

foro apelativo o a esta Curia.  Sólo tuvo disponible para presentar ante el Tribunal de Circuito de Apelaciones o este Tribunal cualquiera de esos escritos cuatro (4) días laborables del período pre-electoral.  No obstante, presentó su demanda ante el Tribunal de Primera Instancia a tiempo o sea el 20 de marzo de 2003 y su recurso de apelación ante el Tribunal de Apelaciones el 9 de mayo de 2003, que estuvo sometido y completo para disposición final por éste último desde el 30 de julio de 2003, todo muchos meses antes de que concluyera el período preelectoral y tan pronto surgió la controversia, o sea después de los dos (2) primeros años del actual cuatrienio que es cuando comienza la campaña gubernamental impugnada.[23]  Era deber y obligación ministerial del Tribunal de Apelaciones atender este asunto con urgencia, pues es a los Tribunales los que les corresponde resolver con premura los méritos de un reclamo o ruego  de **"cese y desista"** que se les dirija, en este caso por la parte demandante apelante, aquí peticionaria.  El permitir el Tribunal de Apelaciones, con su inacción, que el lapso del tiempo pudiera convertir en académico ante este Tribunal lo traído ante

_____

[23] Quedó sometido este asunto para disposición final por el Tribunal de Apelaciones el 30 de julio de 2003 a pesar de que ese Tribunal pudo haber utilizado su facultad a tenor con su Reglamento para acortar términos para los alegatos de las partes para el logro del más justo y eficiente despacho, dada la urgencia del asunto pendiente ante si.  De esa forma hubiera quedado sometido ante sí mucho tiempo antes.  Regla 7(B)(5) del Reglamento del entonces Tribunal de Circuito de Apelaciones, vigente hasta el 19 de noviembre de 2003.

su consideración por la parte allí apelante, en un caso como el presente, podría tener el efecto de favorecer la parte apelada, de existir la probabilidad de que desapareciera el **"caso y controversia"** ante este foro. De convertirse en académico el presente asunto pendiente ante este foro los méritos del caso sobre la conducta gubernamental impugnada no sería resuelto nunca por el tribunal de última instancia de la Rama de Gobierno llamada como un deber ministerial a así hacerlo. La inacción o tardanza del Tribunal de Apelaciones en atender este caso con diligencia y premura, dada la urgencia de lo planteado, produciendo la probabilidad de que este caso se pudiera convertir en académico ante nos resulta **IRRAZONABLE, INAUDITA e INTOLERABLE.**

Los Tribunales pierden su jurisdicción sobre un asunto por academicidad cuando ocurren cambios durante el trámite judicial de un **"caso y controversia"** que hacen que este pierda su actualidad. No obstante, los cambios fácticos o judiciales a que hace referencia la jurisprudencia no pueden comprender bajo ninguna circunstancia posible la inacción de un tribunal y su falta de diligencia en atender con premura un reclamo a nivel primario o apelativo sobre **"cese y desista"**. De otra forma, el reclamo de esta naturaleza que realizara una persona sería atendido por este Tribunal a discreción del Tribunal de Primera Instancia o del Tribunal de Apelaciones, aún cuando el promovente lo haya traído a

tiempo a la Rama Judicial. El Tribunal de Primera Instancia y el Tribunal de Apelaciones deben actuar con diligencia precisamente ante una alegación sobre **"daño irreparable"**. De otra forma su inacción podría producir que desaparezca el **"caso y controversia"** ante esta Curia. Dada la disyuntiva que nos ha colocado el Tribunal de Apelaciones debemos contestar la interrogante siguiente: ¿Se convirtió este **"caso y controversia"** pendiente ante nos en académico y perdió su actualidad por transcurrir el período preeleccionario el 31 de diciembre de 2003 por la falta de diligencia y premura del Tribunal de Apelaciones para atenderlo con la urgencia que el ordenamiento jurídico dicta? Contestamos dicha interrogante en la negativa. El asunto ante nos no es uno que fuera traído a la Rama Judicial por la aquí peticionaria en forma imprevista y litigado a última hora. No era difícil su atención con diligencia y premura por el Tribunal de Apelaciones de forma y manera que nos permitiera descargar nuestro Ministerio.

Este es un asunto que es **recurrente** y es susceptible **de volver a ocurrir**. De la única forma que este asunto evade nuestra revisión judicial, cuando es traído y litigado a tiempo ante el Tribunal de Primera Instancia y el Tribunal de Apelaciones, y no surgen circunstancias exógenas que desvanezcan la controversia, es cuando la Rama Judicial no actúa con premura y en forma diligente. El **"caso y controversia"** resuelto en

**P.P.D. v. Gobernador I**, *supra* no había sido atendido antes, a pesar de que había imperado tal conducta por previas administraciones de gobierno, por no haber sido traído y litigado a tiempo en los tribunales por las partes afectadas. El anuncio impugnado ya no se estaba publicando. No obstante, este Tribunal entendió que ese **"caso y controversia"** no era académico. El **"caso y controversia"** resuelto en **Emp. Pur. Des., Inc. v. H.I.E.TEL.**, *supra,* fue traído a tiempo a la Rama Judicial y resuelto con diligencia y premura por el Tribunal de Primera Instancia y el entonces Tribunal de Circuito de Apelaciones. La expresión concertada de la Unión en el centro comercial ya había terminado y la compañía telefónica ya no era arrendataria de la empresa dueña del mismo cuando la controversia llegó a este Tribunal para disposición final. No obstante, esta Curia entendió que dicho **"caso y controversia"** no era académico revocando al Tribunal de Primera Instancia y al entonces Tribunal de Circuito de Apelaciones que habían resuelto lo contrario. A pesar de que el asunto de autos refleja la **"expectativa razonable"** y **"la probabilidad demostrada"** de que la misma controversia recurrirá en el futuro este Tribunal concluye que este **"caso y controversia"** es académico.

Al presente persiste dentro de este **"caso y controversia"** el alegado efecto sobre las elecciones generales de noviembre de 2004 de la **"consecuencia**

**colateral"** constitutiva de la desigualdad económica alegada entre el P.P.D. y el P.N.P., durante el tercer año del cuatrienio como resultado de la conducta gubernamental impugnada. La alegación del P.N.P. va dirigida directamente a que la utilización por el partido de gobierno (P.P.D.) de fondos públicos para lo que alega es una campaña política partidista viola el esquema democrático constitucional y estatutario que vive Puerto Rico y **le infringe un daño irreparable** al brindarle una ventaja económica indebida e ilegal al partido de gobierno (P.P.D.) en las próximas elecciones generales. Considerado sólo este punto tendríamos que concluir que **el asunto ante nos no es académico.**

No creemos que el curso a seguir por este Tribunal debía ser esperar a que recurra en el futuro este asunto nuevamente para concluir que como en el pasado se dio una situación similar (el presente caso) que hizo difícil o evitó la revisión judicial del asunto por esta Curia ese caso (futuro) no es académico y por ende debemos atenderlo para considerar la aplicación de la norma sentada en **P.P.D. v. Gobernador I,** *supra*. De la única forma que este asunto podría evadir revisión judicial a esos efectos es que este Tribunal no lo atienda **AHORA.** Creo que el asunto ante nos presenta un **"importantísimo problema de la colectividad que amerita resolverse urgentemente".** Creo que este caso nos brinda la oportunidad de **"fortalecer la democracia que vivimos".**

Esta es **"la oportunidad futura, de mayor serenidad"** esperada para determinar si es conveniente el proveer a la norma sentada en **P.P.D. v. Gobernador I,** *supra,* guías objetivas y adecuadas que el gobierno central y los municipios puedan entender y aplicar en el futuro con el propósito de poder acatar y cumplir con ella. Este Tribunal **CLAUDICA su MINISTERIO.** Al no pasar juicio sobre el presente **"caso y controversia"** este Tribunal ha **CONCULCADO** su función revisora en tan importantísimo asunto. Esta oportunidad nos permite **AHORA "fortalecer aún más la democracia puertorriqueña".**

III

**Igualdad Electoral y Económica de los Partidos Políticos
en el Periodo Pre-electoral**

La Sección 2 del Artículo II de la Constitución de Puerto Rico[24] dispone que las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal igual, directo y secreto y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral. Dicha disposición constitucional consagra el principio básico de que el poder político emana del consentimiento y de la voluntad popular para imponer al Gobierno una responsabilidad dual: la de abstenerse de interferir con el ejercicio del sufragio universal igual, directo y secreto y la de proteger al

---

[24] 1 L.P.R.A. Art. II, Sec. 2.

ciudadano contra toda coacción en el ejercicio de tal prerrogativa electoral. El elector es acreedor a que su voto sea protegido por el Estado de distintas formas y con distinto vigor en una multiplicidad de situaciones.[25]

En la medida que se subvencione una campaña político partidista con fondos públicos se le permite una ventaja al partido político de gobierno sobre los demás, lo cual atenta contra el axioma de igualdad electoral y socava los pilares del esquema electoral, que garantiza la igualdad económica entre los partidos políticos, sin limitarlo al período eleccionario. Esto afecta detrimentalmente el derecho de los electores a ejercer su voto libre de cualquier coacción toda vez que estos son componentes esenciales de los partidos políticos y por ende son colocados en la misma desventaja económica que su partido político, frente al que subvencionó parte de su campaña política en el período pre electoral con los fondos de todo el Pueblo, incluso los de esos electores pertenecientes a un partido político de oposición al gubernamental.[26]

Hemos reconocido que la expresión del Gobierno de naturaleza educativa e informativa es indispensable para que el pueblo pueda juzgar su labor y exigir remedio a

---

[25] P.P.D. v. Gobernador I, *supra*.

[26] Id.

los agravios gubernamentales.[27]   Nuestra jurisprudencia

refleja la tendencia seguida a favor de la divulgación de

información pública, al punto de impartirle una dimensión

amplia y robusta a la libertad de expresión consagrada en

nuestra Carta de Derechos.[28]

Hemos expresado en forma reiterada que existe una

estrecha relación entre el derecho a libre expresión y la

libertad de información.  Sin conocimiento de hechos no

se puede juzgar.  Tampoco se pueden exigir remedios a los

agravios gubernamentales mediante los procedimientos

judiciales o través del proceso de las urnas cada cuatro

(4) años.[29]  No obstante, los derechos contenidos en la

Carta de Derechos[30] le asisten a los individuos frente al

Estado.  Esos derechos no pueden extenderse a las

expresiones del Gobierno porque los derechos civiles y

políticos están formulados en términos de lo que el

Estado no puede hacer con relación a la expresión de los

individuos y no a la inversa.  El Gobierno no tiene un

derecho constitucional protegido a la libre expresión.[31]

---

[27] Id.; Romero Barceló v. Hernández Agosto, 115 D.P.R. 368, 381 (1984); Santiago v. Bobb y El Mundo, Inc. 117 D.P.R. 153, 158 (1986).

[28] P.P.D. v. Gobernador I, supra; Noriega v. Gobernador, 130 D.P.R. 919 (1992); Noriega v. Gobernador, 122 D.P.R. 650 (1988); López Vives v. Policía de P.R., 118 D.P.R. 219 (1987) y Soto v. Srio. de Justicia, 112 D.P.R. 477, 485 (1982).

[29] P.P.D. v. Gobernador I, supra; Santiago v. Bobb y El Mundo, Inc., supra y Soto v. Srio de Jusiticia, supra.

[30] Artículo II de la Constitución de P.R., 1 L.P.R.A. **Art. II.**

[31] P.P.D. v. Gobernador I, supra.

El proceso decisional puertorriqueño responde en su realidad al postulado de igualdad inmerso en la Constitución de Puerto Rico el cual persigue lograr una igualdad y paridad económica entre los partidos políticos para divulgación de ideas y de mensajes en el país. De ello resulta que exista un amplio poder para la limitación de la propaganda gubernamental.[32]

El Artículo 8.001 de la Ley Electoral de Puerto Rico, *supra,* prohibe que la Rama Ejecutiva y sus agencias, la Asamblea Legislativa y la Rama Judicial, a partir del 1 de enero del cuarto año de un cuatrienio o cuando debe celebrarse una elección general y hasta el día siguiente a la fecha de su celebración, incurran en gastos para la compra de tiempo y espacio en los medios de difusión pública con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes. En año electoral todo anuncio gubernamental, excepto los expresamente excluidos por ley, deben ser sometidos a la previa autorización de la Comisión Estatal de Elecciones.[33]

La Sección 9 del Artículo VI de la Constitución de Puerto Rico, *supra*, prescribe sobre la disposición por el Gobierno de los fondos públicos. Sólo pueden ser usados para un **"fin público"** y para el sostenimiento y funcionamiento de las instituciones del Estado, por

---

[32] Id.

[33] Id.

autoridad de ley.  La formulación por la Rama Ejecutiva o la Legislativa sobre lo que es un **"fin público"** es revisable por la Rama Judicial.  No obstante, a la luz del sistema de separación de poderes, los tribunales deben actuar con prudencia y deferencia a la voluntad legislativa, siempre que ella esté enmarcada dentro del esquema constitucional.[34]

El concepto **"fin público"** no es estático, pero si está ligado al bienestar general que tiene que ceñirse a las cambiantes condiciones sociales de una comunidad específica, a los problemas peculiares que éstas crean y a las nuevas obligaciones que el ciudadano impone a sus gobernantes en una sociedad compleja.  Los objetivos que están contenidos en un **"fin público"** deben redundar en beneficio de la salud, la seguridad, la moral y el bienestar general de la ciudadanía.  Los criterios para determinar  lo que es un **"fin público"** se reducen  a que contemple un beneficio público o que estén destinados a una actividad de carácter publico o semipúblico.  Si la actividad que ha de ser costeada con fondos públicos promueve los intereses y objetivos de la entidad gubernamental, en  consonancia con la política pública establecida sobre el particular, es evidente el **"fin público"** y el carácter legítimo de dicha erogación.  Una vez se determina que existe un **"fin público"** en relación a la erogación de fondos por una entidad gubernamental,

---

[34] Id.

el hecho de que surja un beneficio incidental en favor de personas particulares no desvirtúa el **"fin publico"** a que va dirigida la actividad gubernamental.[35]

El Gobierno de turno no puede utilizar los fondos públicos para beneficio del partido político en el poder. En la medida en que los fondos públicos se utilicen para propaganda político partidista para beneficio del partido político de gobierno se está afectando detrimentalmente el derecho de los electores de los demás partidos políticos. No se permite el uso político partidista de los fondos públicos. Tampoco es permitido al partido político de gobierno o candidato a puesto electivo de esa colectividad a que obtenga una ventaja económica a expensas del erario público. La verdadera esencia de un gobierno libre consiste en considerar los puestos públicos como un fideicomiso, encomendado para el bien del país y no para el beneficio de determinado partido político o grupo de individuos o electores.[36]

En **P.P.D. V Gobernador I**[37] expresamos sobre este asunto, lo siguiente:

> Los criterios que se derivan de nuestra jurisprudencia para determinar si existe o no un **fin público** -cuando mediante una ley o una actuación gubernamental se realiza una erogación de fondos públicos- son aplicables a la controversia que nos ocupa. **Por un lado, cuando el Gobierno, en el ejercicio de su facultad o deber de informar a la ciudadanía, utiliza o incorpora símbolos, emblemas, colores,**

---

[35] Id.

[36] Id.

[37] Supra, págs. 690-704.

fotografías o lemas de naturaleza político-partidista, estamos impedidos constitucionalmente de reconocerle fin público alguno a dicha expresión gubernamental. Tampoco podemos reconocer validez constitucional a cualquier expresión gubernamental difundida mediante el uso de fondos públicos cuando ésta claramente constituye un subterfugio para conferir una ventaja a un candidato o a un partido político, o para adelantar sus interes políticos-partidistas. *Cf. Marrero v. Mun. de Morovis*, supra.

De otra parte, ausente en la expresión gubernamental cualquier símbolo, emblema, color, fotografía, lema de naturaleza político-partidista, o el propósito de conferir una indebida ventaja a un candidato o partido político, la determinación de si la utilización de fondos públicos responde a un fin público requiere determinar su propósito y evaluar su contenido para adjudicar si cumple con alguno de los criterios siguientes:

1. Redunda en beneficio de la salud, la seguridad, la moral y el bienestar general de todos los ciudadanos.

2. Está destinado a una actividad de carácter público o semipúblico.

3. Promueve los intereses y objetivos de la entidad gubernamental, en consonancia con sus deberes y funciones o la política pública establecida.

4. Promueve programas, servicios, oportunidades y derechos, o adelanta causas sociales, cívicas, culturales, económicas o deportivas.

5. Promueve el establecimiento, modificación o cambio de una política gubernamental.

Reconocemos que la publicación de expresiones gubernamental mediante el uso de fondos públicos para la consecución de cualquiera de los objetivos enunciados anteriormente, en algunas ocasiones, puede tener el efecto incidental de producir cierto grado de ventaja al partido político en el poder o a un candidato de dicho partido. Pero cuando la evidencia demuestra, por el contrario, que dicha expresión es utilizada como un vehículo para adelantar cualquier fin

**individual de dicho partido o candidato, anulando de tal forma la consecución de un objetivo legítimo, tal expresión no puede prevalecer por constituir una ventaja económica a dicho partido o candidato por sobre los partidos políticos o candidatos de oposición.**

Por el hecho de que la Legislatura no haya extendido expresamente la prohibición contenida en el Art. 8.001, *supra*, a los años en que no se celebran elecciones generales, no podemos validar el uso de fondos públicos para anuncios político-partidistas durante tales años. La restricción a este tipo de actuación se encuentra en la Sec. 9 del Art. VI de nuestra Constitución, *supra,* la cual no requiere de una ley específica para su aplicación y en el axioma constitucional de igualdad electoral.

. . .

En este caso el P.P.D. impugnó una serie de anuncios publicados por algunas dependencias del Gobierno y Corporaciones públicas, **alegando que constituían una campaña concertada y desarrollada por el Gobierno en coordinación con el P.N.P.** Mediante estipulación de las partes, se presentaron en evidencia los anuncios impugnados, al igual que prueba pericial en las áreas de comunicaciones y publicidad.

En cumplimiento con nuestra Orden de 1ro. de diciembre de 1995 el Tribunal de Primera Instancia nos remitió las determinaciones de hecho resultantes de la referida evidencia. Evaluadas éstas, a la luz de toda la prueba obrante en autos, incluso la transcripción de los testimonios periciales, concluimos que tales determinaciones están plenamente sostenidas por la prueba, en vista de lo cual las adoptamos y concluimos lo siguiente:

1. Los anuncios de la Oficina de Gerencia y Presupuesto, del Departamento de Educación, del Departamento de Transportación y Obras Públicas, de la Autoridad de Carreteras y del Departamento de Corrección y Rehabilitación **destacan la labor realizada por dichas dependencias gubernamentales e incluyen el lema "compromiso cumplido" o la frase "el Departamento ha cumplido con el compromiso del Gobernador Pedro Rosselló". De este modo se resaltan los supuestos logros de dichas dependencias públicas y utilizan el lema propagandístico del partido en el**

**poder con el propósito de conferir una ventaja al candidato a la gobernación de dicho partido.**

2.    Los anuncios de la Administración de Seguros de Salud, del Departamento de la Familia, del Departamento de Trabajo y Recursos Humanos, y de la Administración de Compensaciones por Accidentes de Automóviles **proveen información de alguna utilidad o beneficio a la comunidad, promoviendo programas y servicios, pero los mismos incluyen el lema de "*compromiso cumplido*", lo que demuestra el claro propósito de adelantar y promover los fines políticos del partido en el poder y de su candidato a la gobernación.**

3.    A pesar de que los anuncios del Departamento de Educación **incluyen información sobre los servicios ofrecidos por dicho departamento, incluyen, además *un recuadro en el que se expresa que se ha cumplido con el compromiso del Dr. Pedro Rosselló,* utilizando el lema propagandístico de dicho candidato y con el obvio propósito de conferir a éste una indebida ventaja sobre los candidatos opositores.**

4.    Los anuncios del Departamento de Hacienda **informan cambios o reformas que afectan a la ciudadanía, *pero incluyen la frase "compromiso cumplido",* en obvia referencia al candidato a la gobernación del partido en el poder y con iguales fines político-partidistas que los mencionados anteriormente.**

5.    Solamente cuatro (4) anuncios de los evaluados **carecen de mensajes político-partidistas.** Estos anuncios corresponden a las siguientes agencias:(a) Departamento de la Familia (en éste se promueven las oportunidades de empleo para ciudadanos de cincuenta y cinco (55) años o más); (b) Departamento del Trabajo y Recursos Humanos (en este anuncio se promueve el empleo de residentes en viviendas públicas); (c) Departamento de Salud (promueve y provee información sobre la lactancia materna); (d) Departamento de Transportación y Obras Públicas (en este anuncio se avisa o alerta al público sobre

un programa de mejoras a la transportación
en el área metropolitana de San Juan).

Con excepción de los cuatro (4) anuncios antes indicados, la campaña publicitaria del Gobierno se caracteriza por el lema "compromiso cumplido", acompañado de una marca de cotejo. A pesar de que resulta evidente que la utilización de este lema responde a fines político-partidistas, la prueba pericial despejó todo tipo de duda al demostrar fehacientemente que el lema en cuestión corresponde a la campaña que simultáneamente conduce el P.N.P. en consideración a las elecciones generales de 1996. Observamos, además, que mientras la campaña publicitaria del Gobierno se distingue por el lema "compromiso cumplido", en la campaña del P.N.P. se enfatiza las supuestas promesas "sin cumplir" de Héctor Luis Acevedo, candidato a la gobernación por el P.P.D. A su vez, estos estribillos se complementan con el lema "prometimos y cumplimos" que se destaca en el comité central de campaña del P.N.P.

Concluimos que en este caso nos encontramos ante una campaña publicitaria concertada, de manifiesto corte político-partidista, subvencionada con una gran cantidad de fondos públicos , so pretexto de cumplir con un fin publico determinado. *La utilización de símbolos o insignias de naturaleza político-partidista, tales como la palma y la estrella, ciertamente identificables con el P.N.P., es contraria al fin público que exige nuestro ordenamiento constitucional en la administración del erario y al axioma de paridad económica entre las fuerzas electorales que le sirve de norte.* Como acertadamente destaca el Prof. Steven Shiffrin, "permitirle al gobierno, armado con el mayor tesoro de campaña—el erario público—intentar dominar un proceso electoral, atenta contra la integridad básica del proceso democrático". (Traducción nuestra). S. Shiffrin, *Government Speech,* 27 UCLA L. Rev. 565, 612 (1980). A fin de cuentas, "no es función del Gobierno, reelegirse a sí mismo". (Traducción nuestra.) E. Ziegler, *Government Speech and the Constituition: The Limits of Official Partisanship,* 21 B.C. L. Rev. 578, 604 (1980), citando a T. Emerson, *The System of Freedom of Expression* 698-699(Vintage Ed. 1971).

...De la evidencia que tuvo ante sí el Tribunal de Primera Instancia surge palpablemente el propósito de los demandados de influenciar la opinión pública a favor del partido de gobierno y de su candidato a la gobernación, el actual incumbente Dr. Pedro Rosselló González, **mediante una masiva campaña de medios en forma coordinada entre las agencias y dependencias del Gobierno y el P.N.P. mediante el uso repetido de lemas y estribillos de campaña, logros y símbolos del partido en el poder, la fotografía del mencionado incumbente, colores que identifican a dicho partido y el empleo de técnicas visuales que no tienen otro propósito que el de obtener el favor de los votantes en la campaña electoral que se avecina.** Todo ello al amparo de un supuesto -y muy lejano- propósito de informar a la ciudadanía del funcionamiento de su gobierno. Si algún objetivo público se logra en estos casos, éste palidece ante la deslumbrante campaña publicitaria que lleva a cabo el Gobierno con el fin obvio de realzar la imagen del P.N.P. y de su candidato a la gobernación en las próximas elecciones generales.

. . .

No nos corresponde pasar juicio sobre la sabiduría de los gastos incurridos en publicidad, siempre que estos respondan a fines públicos. Sin embargo, es nuestra responsabilidad, como máximos interpretes de la Constitución, velar por que estos fondos respondan directamente a las necesidades de la ciudadanía y no a los fines de partido o candidato político alguno. Tomando conocimiento judicial de ello, nos preocupa la proliferación de varias publicaciones hechas y distribuidas en los últimos días, aparentemente con fondos públicos, por otras administraciones municipales y ramas de gobierno que adolecen de los mismos defectos constitucionales que hoy señalamos.

Indiscutiblemente, el Gobierno se extralimitó en su facultad o deber de mantener al Pueblo informado, violando de esta forma la disposición constitucional que confina la utilización de fondos públicos a fines públicos y el axioma constitucional de igualdad económica de los partidos y candidatos a puestos electivos. Por tal motivo, *procede que dictemos el "injunction"*

*preliminar, solicitado en este caso, para prohibir a los funcionarios demandados y al Estado Libre Asociado de Puerto Rico la publicación, costeada con fondos públicos, de anuncios de la naturaleza de los mencionados anteriormente, y para extender tal prohibición a sus agentes, funcionarios, mandatarios y empleados, ya sea que éstos actúen solos o de común acuerdo con otras personas. Se prohibirá, además, al Estado Libre Asociado de Puerto Rico, a los demás demandados y a sus agentes, funcionarios, empleados y mandatarios, el desembolso de fondos públicos para el pago de las publicaciones hechas de tales anuncios o que, en lo sucesivo, se hagan en violación a la referida orden de "injunction", hasta tanto otra cosa se disponga finalmente en este caso.*

*Se ordenará ,además, la devolución de este caso al Tribunal de Primera Instancia para la continuación de los procedimientos todavía pendientes en forma compatible con lo aquí resuelto. Reconocemos que el foro de instancia tiene facultad, a base de la evidencia que se le presente, para extender permanentemente el "injunction" preliminar que hemos dictado, incluso la facultad de prohibir permanentemente cualquier actuación, conducta, campaña o actividad de parte de los demandados que haya sido llevada a cabo o se lleve en el futuro, en violación de las normas expuestas en esta opinión. Igualmente se reconoce la facultad de dicho tribunal para ordenar cualquier otro remedio que en derecho proceda, incluso la compensación de los daños sufridos por la parte demandante, todo ello después de dar oportunidad a la parte demandada de ser oída y presentar sus defensas.* (Énfasis suplido).

El entonces Juez Asociado señor Negrón García expresó en su opinión concurrente,[38] sobre este asunto, lo siguiente:

"No es función del gobierno, por sí, lograr su reelección."

Bajo el *postulado multidimensional de igualdad* inmerso en nuestra Constitución, en interacción con otros derechos fundamentales, principalmente ante el

---

[38] Id., págs. 706-724.

Art. VI, Sec. 9 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, no es válido ni permisible el uso de fondos públicos para anuncios y campañas publicitarias propagandistas de carácter político-partidista, sea clara, indirecta, sutil, disimulada, sofisticada o esté entremezclada con actividades informativas legítimas.

"A fin de cuentas, se llaman ´fondos públicos˙ porque provienen de todos los contribuyentes del país y del más amplio *spectrum político. NO SON PRIVATIVOS DE QUIENES POLÍTICAMENTE OSTENTAN LAS RIENDAS DEL PAIS DURANTE DETERMINADO CUATRIENIO."* Noriega v. Hernández Colón, 126 D.P.R. 42, 72 (1990), voto disidente. "Y tras el telón, los fondos públicos van a parar a las `agencias de publicidad [que] cuentan con expertos conocedores de la conducta humana. *Ideas, imágenes, detalles visuales y gráficos aparentemente insignificantes pueden esconder solapadamente un mensaje político.* Por lo tanto, no podemos abstraernos de los adelantos de la industria de las comunicaciones y del desarrollo de complejas técnicas para encubrir mensajes. (Cita omitida).

. . .

*Los funcionarios del gobierno central o municipal en el poder no tienen derecho a usar el dinero público para su reelección; en el sentido, el Estado y la administración de turno no son sinónimos. Este criterio y rigor jurídicos de juzgar no son nuevos.* Desde el voto disidente en *P.P.D. v. Junta Revisora Electoral*, 109 D.P.R. 464, 465 (1980), consignamos "nuestro deber judicial darle virtualidad y convertir en realidad el ideal legislativo de *igualdad* en el debate político". (Énfasis en el original). Hace mucho tiempo descubrimos que "[l]a igualdad es ingrediente medular del ideal de justicia que constantemente *late* en la Constitución. Por su naturaleza dinámica es susceptible de manifestarse en diversas dimensiones". (citas omitidas). Allí declaramos que el *"principio de igualdad electoral es continuo...* [e] intenta disuadir que en determinada época un partido, que controla mayoritariamente los poderes ejecutivo o legislativo, o lo comparta con otro –mediante anuencia o consenso– ... *agrave la situación de los partidos de oposición existentes,* o introduzca cambios de cual[quier] forma en las leyes y reglas que rigen la contienda electoral en beneficio y ventaja...".(Citas omitidas).

. . .

Irónicamente, el monopolio que tiene el Gobierno sobre el uso de la fuerza como factor coercitivo, junto a sus inmensos recursos económicos, lo hacen propenso a la arbitrariedad y lo dotan de unos poderes de persuasión y coacción que podrían convertirle en la peor amenaza a la legitimidad de nuestra democracia. Para que funcione la democracia no es suficiente limitar el control que puedan tener los intereses económicos sobre las elecciones. Es imperativo impedir que un grupo de ciudadanos utilice los recursos del Estado para propaganda, máxime cuando son los mismos incumbentes que mediante ese abuso intentan permanecer en el poder. "Lo contrario atentaría contra el principio supremo que insufla vida a la misma Constitución, esto es, recoger la voluntad del Soberano, que no es otro que el Pueblo". (Citas omitidas).

Las comunicaciones y propaganda gubernamental, especialmente aquellas que gozan de un carácter fundamentalmente político-partidista, adolecen de varios defectos constitucionales. *Primero*, al publicar anuncios partidistas, el Gobierno viola la jerarquía de poder político establecido en nuestra Constitución. *Preámbulo*, supra; Art. I, Sec. 2 y Art. II, Sec. 2, Const. E.L.A., *supra*. *Nos encontramos ante un intento gubernamental de subvertir esta jerarquía, esto es, tomarla al revés; el pueblo, aunque soberano, tiene ante sí al Gobierno tratando de controlar y manipularlo.* Segundo, se apunta el efecto nocivo que puede tener la propaganda del Gobierno sobre la libertad de expresión de los ciudadanos; el "libre mercado de ideas", y la libertad de asociación.

Advertimos, pues, que mediante el uso de propaganda, el Gobierno puede manipular sutilmente la opinión pública "para prescribir lo que será ortodoxo"; quizás más efectivamente que la censura directa. Este peligro alcanza su mayor magnitud cuando los funcionarios gubernamentales utilizan los poderes de comunicación y fondos del Gobierno para adelantar una agenda político-partidista. En campañas publicitarias masivas, como la de estos casos, estamos ante una burda distorsión de lo que se supone sea la comunicación Gobierno-ciudadano. La *información gubernamental acapara y satura el mercado de ideas; es decir los anuncios y comunicaciones gubernamentales son tan*

*extensos e intensos que tienden a ahogar las expresiones de otros partidos políticos, entidades ciudadanas e individuos.*

**La participación del Gobierno y sus funcionarios incumbentes en el debate político, en cuanto persiguen mantenerse y crear una nueva "opinión pública", ataca directamente aquella autonomía de conciencia y pensamiento los ciudadanos en la cual descansa la justificación de los derechos de libertad de expresión y de sufragio.** *¿Qué otro objetivo tiene la propaganda sino la manipulación de la opinión?* **El extender al pueblo las consignas y los lemas partidistas del gobernante de turno en la propaganda gubernamental, ¿no es instrumento para moldear, formar, canalizar y dirigir la opinión ciudadana hacia un eventual triunfo electoral?**

. . .

Esta distinción fundamental nos lleva al tercer defecto constitucional del desembolso de fondos públicos para la publicación de anuncios político-partidistas: *una lesión al postulado de igualdad económica entre los partidos políticos.* (Citas omitidas).

...estos casos versan sobre un gasto ilícito del tesoro público para mejorar la imagen de los incumbentes del partido de turno (central y municipal). Además de reflejar una mala administración de esos dineros, per se constituye una práctica ilegal e inconstitucional, que independientemente pueda generar unos resultados electorales negativos, es justiciable y puede remediarse judicialmente.

El argumento, sin embargo, nos permite adentrarnos en el cuarto y principal defecto constitucional: los anuncios partidistas violan la prohibición de usar fondos públicos para fines no públicos. El efecto claro de estas infracciones es el derroche del tesoro público, ***en detrimento de los partidos de oposición y todo ciudadano;*** y de que se beneficien políticamente al partido que gobierna, los funcionarios incumbentes y, por añadidura, el lucro de las agencias de publicidad y demás medios de difusión.

La interrogante principal consiste en determinar cuales fines son públicos y legítimos. El concepto "fin público se define mediante

referencia a otras disposiciones que a continuación veremos en la misma Constitución. En particular, cuando un desembolso gubernamental lesiona los valores encarnados en la libertad de expresión y en el derecho al voto, el desembolso no responde aun *fin público* por ende, es ilegal. (Énfasis suplido.)

El Juez Asociado señor Hernández Denton expresó en su opinión de conformidad,[39] sobre este asunto, lo siguiente:

> **Resulta claro que la protección constitucional no se limita a la veda de la Ley Electoral de Puerto Rico. La veda dispuesta en el Art. 8.001, *supra*, es una medida, entre otras posibles, para garantizar la paridad. La medida legislativa no determina, por sí sola, el alcance del axioma de la igualdad y paridad económica.**

> Debe recalcarse que el propio legislador ha reconocido implícitamente que el principio de la igualdad y paridad económica entre los partidos no se limita al año electoral ni a fechas cercanas a eventos electorales. A esos efectos, la Ley Electoral de Puerto Rico provee para la subvención equitativa de fondos públicos para los partidos políticos, tanto en años electorales como en los años no electorales del resto cuatrienio. Art. 3.023 de la Ley Electoral de Puerto Rico, Ley Núm 4 de 20 de diciembre de 1977, según enmendado, 16 L.P.R.A. sec. 3116. Como resultado de la Ley Electoral de Puerto Rico, los partidos tienen un derecho a recibir esa subvención, si cumplen con los requisitos dispuestos en el estatuto, y una expectativa legítima de que el Estado tomará las medidas correspondientes para asegurar que se distribuirán en partes iguales.

> **En síntesis, nuestro orden constitucional y la ley Electoral de Puerto Rico les reconocen a los partidos políticos *un interés legal de paridad* económica frente a los demás partidos que compiten en la contienda electoral. Por lo tanto, éstos tienen un interés legítimo en asegurar ese trato igual en la subvención directa o indirecta de fondos, tanto en años electorales, como en el resto del cuatrienio. Bajo el palio de este ordenamiento, el uso de fondos públicos para fines político-partidistas en cualquier**

---

[39] Id., págs. 769-789.

**período del cuatrienio por parte del partido gobernante resulta en un claro menoscabo del derecho a la paridad de los partidos opositores y del interés legal protegido por el axioma de igualdad inmerso en nuestra Constitución.**

. . .

En el caso particular de las campañas publicitarias del Gobierno, su validez depende de que cumplan con los parámetros constitucionales de la Sec. 9 del Art. VI, Const. E.L.A., *supra.* Como correctamente concluye la opinión del Tribunal, esta decisión requiere **"determinar su propósito y evaluar su contenido"** para adjudicar si cumple con los preceptos constitucionales. **La determinación del propósito de las campañas es decisiva**, dado que la prohibición constitucional del Art. VI, Sec. 9, *supra*, está concebida a base de fines o propósito: "Sólo se dispondrá de las propiedades y fondos públicos *para fines públicos* y para el sostenimiento y funcionamientos de las instituciones del Estado ...." Art. VI, Sec. 9, Const. E.L.A., *supra*, pág. 369.

Cuando en los anuncios gubernamentales prevalece un propósito partidista, se lesiona el principio de igualdad electoral, lo cual constituye una violación del imperativo constitucional de la Sec. 9 del Art. VI de nuestra Constitución, *supra. P.P.D. v. Gobernador II, supra.* **Conscientes de este principio rector en nuestro ordenamiento, coincidimos con la opinión mayoritaria en que el axioma constitucional de igualdad no tolera una campaña de anuncio es que, vistos en su totalidad, muestren un propósito manifiesto o subyacente de naturaleza político-partidista.**

Para poder determinar su propósito es indispensable examinar el contenido de la campaña y evaluar si ésta tiene un propósito político partidista. A tales efectos, debemos examinar, entre otros, los criterios siguientes:

1. **Si la expresión contiene ataques directos a los partidos o candidatos de oposición.**

2. **Si vista la campaña en su totalidad, el valor informativo y el beneficio para el ciudadano es mínimo y está subordinado a la exaltación de la figura u obra del incumbente.**

3.  **Si la expresión contiene mensajes, frases, insignias, logos, colores o figuras identificadas con el partido político en el poder.**

4.  **Si existe un vinculo entre el plan, diseño y desarrollo de una campaña gubernamental con la campaña del partido político en el poder. Cualquier designio o plan común entre las campañas del Gobierno y las de cualquier partido resulta inadmisible en nuestro orden constitucional.**

Aunque la cantidad de fondos utilizados en la campaña del Gobierno no es un elemento decisivo, sin duda es un factor a considerarse en la determinación de fin público. Dicho gasto debe ser visto en el contexto de un país como el nuestro, con fondos limitados y con muchas necesidades primordiales carentes de ayuda gubernamental.

A la luz de estos criterios, sin pretender ser exhaustivos, estimamos permisibles los anuncios informativos con avisos y notificaciones relacionados a actividades gubernamentales. En muchos de esos casos se trata de una publicación o difusión exigida por el propio ordenamiento legal.

**... nuestros pronunciamientos no impiden que los funcionarios electos celebren conferencias de prensa, pronuncien discursos o mensajes al país, escriban columnas o artículos, o concedan entrevistas a los medios de comunicación para exponer sus posiciones particulares sobre asuntos de interés público.**

**Lo que sí significa es que si estos funcionarios quieren llevar a cabo campañas publicitarias para enaltecer su imagen o atacar a sus oponentes, deben sufragarlas de su propio peculio o con fondos de sus respectivos partidos políticos.**

. . .

**No se trata de que un anuncio en particular no pueda demostrar una palma o que de ahora en adelante no se pueda utilizar el color azul en anuncios gubernamentales. Lo que sí repudiamos es el**

despliegue repetido y continuo de dichos símbolos en una campaña dirigida a resaltar la imagen del incumbente y del partido que representa.

De los datos ofrecidos por Publish Records Service se desprende que en esta campaña se gastaron millones de dólares en pocos meses. De esta manera se compró suficiente espacio en los medios pagados para saturar todo el mercado desde la radio y televisión hasta los comerciales en los cines. Esta intensidad en la difusión de los anuncios, de ordinario, rebasa los límites de una campaña informativa.

La prueba también reveló que la campaña se originó en La Fortaleza y que tenía unos elementos unitarios que indicaban que había una dirección central.

Este no es el tipo de campaña publicitaria que se despliega en función de la legítima facultad gubernamental de informar a la ciudadanía. Todo lo contrario. Esta es una campaña coherente y unificada que consiste de diferentes anuncios que destacan que el doctor Rosselló González ha cumplido con las promesas políticas. Vista en su totalidad, en la campaña predomina un propósito político-partidista que choca abiertamente con nuestro orden constitucional. Los fondos públicos no pueden ser utilizados para sufragar una campaña concertada y diseñada para adelantar la causa electoral de partido político alguno.

Por tales razones, el criterio de la mayoría es acertado al reconocer la legitimación activa del P.P.D., endosar las conclusiones del ilustrado Tribunal de Primera Instancia, dictar el *injunction* preliminar y devolver el caso al foro de instancia para la continuación de los procedimientos.

Por todo lo anterior, estamos conformes con la opinión emitida por este Tribunal. (Énfasis suplido)

El Juez Asociado señor Fuster Berlingeri expresó en su opinión de conformidad,[40] sobre este asunto, lo siguiente:

*El Principio de igualdad política*

Existen otras normas constitucionales que también inciden sobre el asunto de los desembolsos públicos. Se trata de normas especiales, relativas a fundamentales valores constitucionales, que acarrean severas limitaciones en cuanto a determinados usos del dinero del pueblo.

**Una de estas normas, de singular pertinencia al asunto que nos concierne en los casos de autos, es la que consagra la esencial igualdad económica de los partidos políticos en cuanto a la divulgación de sus ideas y posturas en el país se refiere. (Citas omitidas).**

**El referido principio de igualdad política constituye una fuente de derecho más accesible y más precisa, respecto del asunto que nos concierne aquí, que la del mandato que requiere que los fondos públicos se destinen sólo a fines públicos. Conforme dicho principio, el partido que ostenta el poder de gobernar al pueblo en un momento dado no puede utilizar fondos públicos para promover sus posturas políticas. El Estado y sus instrumentalidades están compelidos a mantenerse neutrales en el debate público político-partidista, por lo que no es permisible la ventaja indebida, que supondría para el partido que está en el Gobierno usar fondos públicos para divulgar sus ideas y mensajes. No puede haber, en una palabra, propaganda política gubernamental.**

**Por la naturaleza misma del principio constitucional en cuestión, están vedados todos los dispendios públicos que tiendan o estén destinados a mantener al partido de gobierno ostentando el poder o a ayudarlo a prevalecer en el debate público. Cualquier ventaja que tenga el partido de gobierno, mediante la utilización de los fondos de la colectividad, constituye una *desigualdad*, por lo que está proscrita. No hay espacio aquí para distinciones de grado. Si el desembolso de**

---

[40] Id., págs. 793-797.

fondos que pertenecen a todo el pueblo adelanta, de cualquier manera, los intereses del sector político en el poder, ello constituye una ventaja sobre los otros sectores políticos, sea ésta grande o pequeña. Lo ilícito de tal ventaja no depende de su dimensión, sino de su ínsita inequidad. Todas están prohibidas, porque todas, inherentemente, aparejan la desigualdad.

Tampoco importa la época en que ocurre la ventaja. Es de conocimiento general que la contienda política acontece incesantemente en Puerto Rico. No existe partido alguno en el país que limite su proselitismo sólo al año de elecciones; ni aspirante o incumbente que no aproveche cualquier ocasión para promover su eventual candidatura. Como en nuestra realidad, la campaña eleccionaria se desarrolla todo el tiempo; el principio de igualdad económica aplica también en todo momento.

Por razón de lo anterior, pues, cualquier desembolso de fondos públicos que tienda a aventajar al partido en el poder, debe considerarse constitucionalmente sospechoso y sujeto al más estricto escrutinio judicial. Deben aplicarse aquí las normas relativas a acciones gubernamentales que, por trato desigual, menoscaban algún derecho fundamental.

*Límites a los anuncios gubernamentales*

Para darle plena vigencia al principio constitucional de igualdad política, reseñado antes, es necesario restringir rigurosamente los anuncios gubernamentales. No basta con prohibir sólo los que son de corte *patentemente* político. Es necesario formular criterios más asépticos. Ello no sólo porque cualquier anuncio gubernamental que represente alguna ventaja política para el partido en el poder socava el principio de igualdad inmerso en nuestra Constitución, sino porque, además para promover la requerida neutralidad gubernamental en el proceso decisional puertorriqueño, es menester evitar la seductora tentación que tienen los gobernantes de turno, ordinariamente, de manipular anuncios legítimos para obtener una ventaja política. El problema que se plantea en los casos de autos es precisamente el de anuncios políticos que se disfrazan como auténtica comunicación gubernamental. Se trata de un problema que no

**se puede resolver adecuadamente si no es extirpa de raíz la posibilidad misma de aprovechar políticamente el anuncio oficial. A ningún funcionario público más o menos avezado se le ocurriría usar los fondos gubernamentales para pagar anuncios crudamente políticos. Ello sería evidentemente ilegal e incluso delictivo. Lo que se hace, más bien, es aprovechar la *zona gris* de los anuncios de cariz gubernamental para insertar solapados contenidos políticos. Para conjurar esa taimada práctica –ante nos ahora– cuyo uso se ha acrecentado en los últimos años, es menester reducir tajantemente el espacio que da margen a la manipulación en los anuncios gubernamentales. Es menester limitar la facultad del Gobierno de comprar anuncios sólo a un reducido número de instancias.**

A tales fines, sólo deben permitirse los anuncios gubernamentales cuyos contenidos y diseño estén estrictamente limitados a dar información, del tipo que las personas de la comunidad necesitan para atender concretamente los asuntos públicos. Los permisibles serían anuncios tales como lo que:

(1)     proveen información sobre deberes particulares que tienen los miembros de la comunidad y el modo de cumplirlos;

(2)     proveen información sobre derechos y opciones específicos que tienen los miembros de la comunidad y los medios para ejercerlos;

(3)     proveen información sobre oportunidades y programas de servicios gubernamentales que pueden beneficiar a las personas de la comunidad y las maneras de aprovecharse de éstos, y/o

(4)     proveen información sobre actividades públicas que las personas de la comunidad pueden disfrutar y los datos sobre dónde y cuándo se celebran.

Los anuncios en cuestión deben ser de *naturaleza impersonal* y no pueden tener contenidos o diseños que no sean los estrictamente necesarios para divulgar la información concreta y específica que va a comunicarse. **Quedarían excluidos, por ejemplo, los *retratos* de los jefes de las agencias o**

**instrumentalidades que publican el anuncio. Quedarían excluidos, claro está, anuncios como lo que están en cuestión en todos los casos de autos.**

**En particular, <u>quedarían excluidos también los anuncios sobre los logros y las promesas electorales cumplidas. Tales anuncios "oficiales" son insidiosamente políticos y, además, son realmente innecesarios</u>. Nadie puede decir cándidamente que en Puerto Rico los incumbentes en cargos gubernamentales no tienen amplios y numerosos medios y ocasiones para divulgar sus logros si no es mediante el uso de anuncios oficiales. Los incumbentes tienen incontables oportunidades para dar a conocer sus logros particulares. Lo hacen en actos oficiales; lo hacen en las innumerables actividades sociales, cívicas y profesionales a que se les invita; lo hacen rutinariamente a través de comunicados de prensa y en entrevistas radiales y de televisión. Los incumbentes, precisamente porque lo son, tienen ventajas naturales en la comunicación social masiva y gratuita, que sus adversarios y contrincantes no tienen. Incluso, tienen ventajas a la hora de levantar fondos para sus campañas políticas, las cuales pueden desarrollar, efectivamente, para comunicar sus logros mediante anuncios políticos pagados. En la vida pública puertorriqueña no existe problema alguno de limitaciones a los incumbentes en la divulgación de sus logros. Por el contrario, el problema es más bien la saturación y el continuo bombardeo que experimenta la comunidad de propaganda sobre los incumbentes. A esos excesos, tolerables en una democracia, no se necesario añadir los abusos de la propaganda oficial que la desmerecen.** (Énfasis suplido).

El Juez Asociado señor Rebollo López expresó en su opinión concurrente y disidente,[41] sobre este asunto, lo siguiente:

Dados los hechos, *particulares y específicos*, de los casos ante nuestra consideración -y salvada, a nuestro juicio, la cuestión de la "legitimación activa" (*standing*) de los

---

[41] Id., págs. 798-800, 806-811.

demandantes para radicar los distintos pleitos- estamos contestes en que las campañas publicitarias impugnadas por los distintos demandantes resultan violatorias de las disposiciones de la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, por lo que procede la expedición de un *injunction prelimiar* prohibiendo las referidas campañas publicitarias.

Dicha determinación, realmente, *no* debería de sorprender a persona alguna. En *primer* lugar, la *controversia planteada* en los casos –no obstante el "cacareo" de las partes– *es una sencilla y específica*, a saber: si las campañas publicitarias de parte del gobierno central y de un municipio de nuestro País, impugnadas por los distintos demandantes en los diferentes pleitos, contienen o no propaganda de carácter político-partidista. En *segundo* lugar, y dado el mensaje, o propaganda, de tipo político-partidista *obviamente inmerso* en los anuncios impugnados en los tres (3) casos, *la conclusión no puede ser otra* en vista de las disposiciones de la Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado, ante. Ello, como veremos más adelante, *independientemente del deber que tiene el Gobierno de informar a la ciudadanía en cumplimiento del derecho de ésta a estar bien informada, e independientemente de que dichos anuncios hayan sido publicados en un año no eleccionario.*

**La mayoría de los integrantes del Tribunal –erróneamente, a nuestro juicio– ha querido ir, y ha ido, *mucho más lejos.* Esto es, *no* se ha conformado con *limitarse* a resolver la "cuestión específica" planteada en los casos. Haciendo uso del "mollero judicial" que recientemente ha descubierto que posee, y al que ya nos tiene acostumbrado, la Mayoría extiende –por *fíat judicial*– la "veda" contenida en el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351, a años *no* eleccionarios; *estableciendo una norma que constituye una innecesaria e impermisible censura o mordaza* que limita o afecta seriamente el *deber* del Gobierno de mantener informada a la ciudadanía en cumplimiento del *derecho* de ésta a estar bien informada, expidiendo el Tribunal un *injunction* que prohíbe, prácticamente, *toda* campaña publicitaria de parte del Gobierno y los municipios.**

*Por otro lado*, la errónea *norma* hoy implantada por la Mayoría *carece* totalmente de *guías objetivas adecuadas* que el gobierno central y los municipios, puedan entender y aplicar en el futuro con el propósito de poder acatar y cumplir con ella. Esta situación desembocará, en los años venideros, en la radicación de *múltiples pleitos*, por los partidos de oposición, contra el partido político de turno -cualesquiera que éstos sean- en donde los primeros, posiblemente, impugnarán *todos y cada uno* de los anuncios que las agencias gubernamentales y los municipios publiquen, inundándose así al foro judicial, único posible árbitro en esta controversia, con pleitos tanto meritorios como frívolos. Ello, desafortunadamente, *causará un caos político y judicial en nuestro País*.

Ahí las razones, en síntesis, por las cuales nos vemos impedidos de poder endosar la Opinión mayoritaria. *Esta situación, por otro lado, nos obliga a expresarnos por separado.*

. . .

Los casos de epígrafe presentan una problemática en común, cual es, la alegación de las distintas partes demandantes de que, tanto el Estado como el Municipio de Carolina, han utilizado fondos públicos en violación de las disposiciones de la antes transcrita Sec. 9 del Art. VI de la Constitución del E.L.A., ante, mediante la publicación de anuncio que constituyen clara propaganda político-partidísta.

La mayoría de los integrantes del Tribunal- en una forma y manera posiblemente nunca antes vista- concluyen que todos los anuncios impugnados adolecen del mismo efecto; esto es, contienen propaganda política, consistente la misma en logos, insignias, colores, frases o ataques a contrincantes político, lo cual hace ilegal dichos anuncios. *No tenemos problema alguno con esa determinación.* Es por ello que *concurrimos* con el resultado; esto es, con la expedición del *injunction* preliminar.

Nuestra *vehemente objeción* va dirigida, o se refiere, a otro aspecto de la opinión mayoritaria. Somos del criterio que una lectura, juiciosa, objetiva y desapasionada de la misma-y, en específico, de algunos de los "votos de conformidad" y concurrencia- *demuestra que una mayoría de los integrantes del Tribunal entiende y sostiene que,* aun en años no eleccionarios y aun cuando los anuncios publicados por el

Gobierno o los municipios no contengan *slogans* símbolos, emblemas, etc., de índole político-partidista, *el anuncio no puede ser publicado y/o no resulta procedente el mismo a menos que éste cumpla con unos criterios que la Mayoría "se ha sacado de la manga" y los cuales son claramente subjetivos;* razón por la cual resultará sumamente difícil, por no decir imposible, que el gobierno central y los municipios puedan saber, de antemano, si sus anuncios cumplen, o no, con los referidos criterios. Ello tendrá la consecuencia, como expresáramos al principio de la ponencia, de inundar al foro judicial–único posible árbitro de esta controversia –con pleitos en los cuales se cuestionará la procedencia, o no, de cada uno de dichos anuncios.

Estamos conformes, *repetimos,* con que, durante año de elecciones y por *disposición expresa* de la Ley Electoral de Puerto Rico, el Gobierno o los municipios no pueden publicar anuncios "con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes". *En adición,* endosamos totalmente la posición de que la Constitución *expresamente prohíbe*–mediante las disposiciones de la citada Sec. 9 del Art. VI- que el Gobierno o los municipios, *durante cualquier año,* publiquen anuncios que contengan logos, emblemas, insignias, frases, etc., de corte político-partidista, *utilizando para ello fondos públicos.*

Con lo que *no* podemos estar de acuerdo, *nunca,* es con la posición de que el Gobierno o los municipios están impedidos de publicar anuncios, *en años no eleccionarios,* con el propósito de *informar* a la ciudadanía sobre sus planes, proyecciones o logros aun cuando los mismos carezcan totalmente de la propaganda político-partidista antes mencionada.

*...no* alcanzamos a comprender cómo alguien, "con cara seria", puede sostener que la presente administración de gobierno no tiene *el deber de informarle a la ciudadanía* sobre la implantación de un sistema de salud, mediante el uso de una tarjeta, *a la cual ,inclusive, el ciudadano tiene que solicitar y suscribirse.* En relación con esta situación en particular, somos del criterio que los anuncios pueden ser publicados, *inclusive,* en el año de veda electoral. *Tampoco* podemos entender cómo se puede argumentar que la presente administración de gobierno no puede informarle a la ciudadanía de la implantación del plan de

"escuelas de la comunidad", el cual representa un *cambio sustancial* en el sistema de instrucción pública del País.

Decimos, con tristeza, lo anterior *por cuanto resulta innegable e indiscutible que ambos programas constituyen claramente política pública de la actual administración gobierno.* ¿Cómo es posible, entonces, que este Tribunal pueda resolver que la actual administración no puede hacer promoción respecto a la implantación de los programas referentes al concepto de la "escuela de la comunidad" y al de la "tarjeta de salud"? *Esto es,* ¿acaso no tiene el pueblo el *derecho* a saber qué está haciendo el Gobierno y hacia dónde éste pretende llevarlo en el futuro? *Prohibirlo resulta un absurdo jurídico y un claro e impermisible acto de cesura o mordaza judicial a la Rama Ejecutiva de nuestro Gobierno.*

Ahora bien, y no obstante lo antes expresado, a lo que *no* tiene derecho la actual administración de gobierno *ni* el Municipio de Carolina- como *tampoco* ninguna otra administración *ni* ningún otro municipio-es a hacer propaganda político-partidista, a través de dichos anuncios y con fondos públicos, mediante el uso de frases, *slogans,* símbolos, emblemas, etc., de corte político-partidista.

En los casos hoy ante nuestra consideración, tanto el gobierno central como el Municipio de Carolina *efectivamente* incurrieron, a través de los anuncios publicados, en actos de propaganda de índole político-partidista al utilizar insignias, frases, etc., lo cual resulta *ilegal* a la luz de las disposiciones de la antes citada Sec. 9 del Art. VI de la Constitución del Estado Libre Asociado. Entendemos procedente, *en consecuencia,* la expedición a esos efectos de un *injunction preliminar* tanto contra el Estado como contra el Municipio de Carolina.

Es por ello, y *únicamente por ello,* que coincidimos con la determinación de la Mayoría de que procede decretar la paralización- a nuestro juicio, de manera preliminar y, *exclusivamente*, por razón de contener las mismas logos, insignias, frases, etc., de corte político-partidista- de las campañas publicitarias impugnadas en los tres casos ante nuestra consideración; *disentimos* de todo lo demás.(Énfasis suplido).

En **P.P.D. v Gobernador II,**[42] el Juez Asociado señor Rebollo López añadió en su voto particular, sobre este asunto, lo siguiente:

> La resolución que hoy emite la mayoría del Tribunal, así como los distintos votos, concurrentes y de conformidad, que suscriben varios de los integrantes de esa mayoría, *son más que suficientes para poder uno percatarse del hecho que efectivamente nos asistía la razón al disentir* " de *todo* lo demás".

> La mayoría, en el día de hoy, *dice que no dijo lo que entonces dijo; que, por favor, no entendamos lo que todos entendimos que dijeron; y esto, a su vez, para que el foro de instancia proceda a hacer lo que supuestamente la Mayoría dice hoy que entonces no dijeron ni ordenaron.* Veamos.

> **Una lectura de la Opinión que el Tribunal emitió el pasado 22 de diciembre de 1995 (P.P.D. V. Gobernador I., 139 D.P.R. 643 (1995) es todo lo que se necesita para uno darse cuenta de que en dicha ponencia la mayoría determinó, *de manera prematura y errónea,* que el demandante Partido Popular Democrático había sufrido un "daño especial", recobrarle en forma monetaria, en relación con el cual no sólo dicha parte demandante no presentó prueba alguna, sino que ni tan siquiera lo alegó ni reclamó en la demanda que dicha parte radicara en el Caso Núm. CT-95-10.**

> **Esta acción del Tribunal, *naturalmente,* contraviene el principio rector en nuestro ordenamiento jurídico a los efectos de que nuestro sistema de derecho es uno "rogado",donde aquel que reclama un daño debe alegarlo y probarlo. Véanse: Regla 10 (B) de Evidencia, 32 L.P.R.A. Ap. IV; *Asoc. Auténtica Empl. v. Municipio de Bayamón, III D.P.R. 527, 531* (1981). Ello, *con más razón*, en el presente caso donde el "daño" reconocido por la mayoría es uno "especial". A esos efectos, la Regla 7.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III, establece que cuando se reclaman "daños especiales", se tendrá que detallar el concepto de las distintas partidas. Véase, en adición,**

---

[42] Supra, págs. 990-992.

*Díaz v. Marchak Auto Dist., Inc.,* 95 D.P.R. 690
(1968).

La mayoría, con el aparente propósito de
asegurarse de que el foro de instancia
"entendiera" bien este asunto de la concesión de
los daños especiales al demandante Partido
Popular Democrático-daños que, repetimos, no
fueron reclamados por dicha parte fue aun más
lejos el pasado 22 de diciembre de 1995. En la
parte dispositiva de la opinión que entonces
emitiera expresó, en lo pertinente, que le
reconocía, además, al foro de instancia la
facultad para ordenar cualquier otro remedio que
en derecho proceda, *incluso la compensación de
los daños sufridos por la parte demandante,* todo
ello después de dar oportunidad a la parte
demandada de ser oída y presentar sus defensas.
(Énfasis en el original suprimido y énfasis
suplido.) *P.P.D. v. Gobernador I*, ante pág.
704.

Hoy, aparentemente conscientes del grave
error cometido, expresa dicha mayoría que:

Este Tribunal no ha expresado juicio
definitivo alguno respecto a la procedencia
de una compensación por daños a la parte
demandada ni a los posibles remedios que,
en su día, el Tribunal de Primera Instancia
pueda ordenar, luego de que las partes
hayan cumplido con todos los trámites
dispuestos por nuestro ordenamiento procesal
vigente. Resolución, pág. 985.

¿En que quedamos? Qué propósito tuvieron las
expresiones que a esos efectos se hicieron el 22 de
diciembre d 1995? La historia nos lo dirá.(Énfasis
suplido).

Durante la celebración del juicio celebrado ante el
Tribunal de Primera Instancia fue presentada abundante
prueba documental, por estipulación de las partes, que
sostenía la ilegalidad de la campaña gubernamental
impugnada. El folleto titulado **"Informe al Pueblo de
Puerto Rico a Dos Años de Administración 2001-2002, Sila
M. Calderón, Gobernadora del Estado Libre Asociado"** fue

insertado en la publicación del diario de circulación general "El Nuevo Día" al cumplirse dos años de la administración de la Gobernadora, honorable Sila M. Calderón en el mes de enero de 2003. El Tribunal de Primera Instancia concluyó que tal folleto claramente constituía un subterfugio para conferir una ventaja a la Gobernadora con el uso de fondos públicos. Cada uno de los encasillados que reflejan las acciones del gobierno está precedido de un pequeño cuadrado con una marca de cotejo (☑) que refleja su cumplimiento con su compromiso con el pueblo, en esa área, tema o materia. **Es una manera no muy sutil y sí clara y directa de comunicarle al pueblo que cumplió en forma específica con sus promesas de campaña sobre los temas generales de gobierno limpio, desarrollo económico y creación de empleos y el ofrecimiento a la familia puertorriqueña de programas y proyectos que contribuyan a mejorar su bienestar y calidad de vida.** [43]

Al final de la última página de ese folleto se intercaló en letras grandes la frase **"Puerto Rico Hacia el Futuro por Buen Camino, Sila M. Calderón, Gobernadora Estado Libre Asociado"**. No obstante, el Tribunal de Primera Instancia concluyó que el **lema "Puerto Rico hacia el Futuro"** no era uno político partidista y que su

---

[43] En <u>P.P.D. v. Gobernador I</u>, *supra* expresamos que tal proceder no era legítimo cuando al informar al pueblo del cumplimiento de los compromisos de campaña tiene el propósito de conferirle una ventaja indebida al partido político en el poder.

utilización en los demás anuncios del Gobierno que comenzaron inmediatamente después de la publicación del folleto no era ilegal. Determinó, además, que el uso de los **colores rojo y amarillo** no fueron utilizados predominantemente por el Gobierno en sus anuncios, y no fueron utilizados por el P.P.D. en forma generalizada en la campaña del 2000. Concluyó que fueron utilizados predominantemente en esa campaña por el P.P.D. en sus anuncios los **colores rojo y blanco**, aunque reconoce que en los mismos se pueden observar personas en actividades político partidistas con **el símbolo del P.P.D. sobre un fondo amarillo** y jóvenes con **camisas rojas y amarillas**. Podemos tomar conocimiento judicial que la honorable Sila M. Calderón Serra cuando aspiró a la Alcaldía del Municipio de San Juan en el 1996 y a la Gobernación en el 2000 utilizó los colores **rojo y amarillo** como distintivos de su campaña política, además, del **rojo y blanco**, colores tradicionales de su partido político. El Tribunal de Primera Instancia concluyó que por no ser el lema **"Puerto Rico hacia el Futuro por Buen Camino"** uno político partidista per se la parte demandante de autos no satisfizo el peso de la prueba para demostrar que la expresión gubernamental como un TODO claramente constituyó un subterfugio para conferir una ventaja al P.P.D. o para adelantar sus intereses político partidistas. Sostuvo que tal frase contenida en los anuncios del Gobierno constituyó un beneficio incidental

a favor de la Gobernadora y de su administración por no desvirtuar el **"fin público"** de los mismos. En cuanto al mensaje televisivo concluyó que tuvo un **"fin público"** pues constituyó una actuación de la Gobernadora en consonancia con sus deberes y funciones de procurar el cumplimiento de las leyes.

En **P.P.D. v. Gobernador I,** *supra* prohibimos y declaramos como ilegal la realización de una campaña de medios en forma coordinada entre la Oficina del Gobernador(a), las agencias y dependencias del gobierno y lideres del partido político en el poder mediante **el uso repetido de lemas y estribillos de campaña, logos y símbolos del partido en el poder, la fotografía del gobernante, colores que identificaron o identifican al gobernante en el proceso político o a su partido político y el empleo de técnicas visuales que no tienen otro propósito que el de obtener el favor de los votantes en la campaña electoral que se avecina.**

La evaluación de la conducta gubernamental impugnada tiene que realizarse en su TOTALIDAD. El análisis que gobierna este asunto es aquel dirigido a detectar la presencia de algún vinculo entre el plan, diseño y desarrollo de una campaña del Gobierno para verificar si tiene o no el propósito de brindarle una ventaja indebida al partido político en el poder (P.P.D.). Cualquier designio o plan común entre la Oficina de la Gobernadora, las agencias y dependencias del Gobierno y lideres del

partido político en el poder con tal propósito es inadmisible en nuestro ordenamiento constitucional. Nuestro Ministerio nos obliga a examinar si existe una coherencia, coordinación y unificación de la campaña gubernamental de la Oficina de la Gobernadora y de las agencias y dependencias del Gobierno con **fondos públicos** dirigida a atacar y proyectar negativamente la obra de gobierno de la anterior administración, de un partido político adversario al suyo, y destacar su presente obra de gobierno con el **lema Por Buen Camino** con el propósito de proyectar positivamente **Hacia el Futuro**, al partido político en el poder (P.P.D.) frente a las próximas elecciones generales. Nuestra función es examinar esa campaña en su TOTALIDAD, no por fragmentos, para poder determinar si co-existe con el **"fin público"** un propósito político partidista que choca abiertamente con nuestro ordenamiento constitucional. Concluimos que en el descargo de su ministerio sobre ese asunto el Tribunal de Apelaciones y el Tribunal de Primera Instancia ERRARON. Veamos.

En la primera página del folleto **"Informe al Pueblo"**, ya mencionado, aparece una **fotografía de la Gobernadora** con un grupo de niños, expresando que hace dos años **"nuestro pueblo"** le encomendó **"una gestión gubernamental abarcadora para encarrilar su futuro"**. Afirma que esa gestión estaba centrada en "tres tareas impostergables: **brindarles al país el gobierno limpio que**

**necesita y merecen los puertorriqueños, hacer del desarrollo económico y la creación de empleos la primera prioridad del servicio público y ofrecerle a la familia puertorriqueña programas y proyectos que contribuyan a mejorar su bienestar y su calidad de vida".**

La segunda página del referido folleto reza de la forma siguiente:

### Gobierno Limpio:
### Ataque Frontal a la Corrupción

Durante los pasados dos años, la Administración ha llevado a cabo acciones contundentes **para devolverle a Puerto Rico el orgullo y confianza en sus instituciones públicas que había sido lacerada por los actos de corrupción gubernamental de los cuales todos hemos sido testigos.** Queremos lograr que los servidores públicos se sientan orgullosos de la profesión que han escogido. Seguiremos adecentando **nuestro gobierno,** para lograr que sea uno justo, sensible, **transparente y abierto** a las necesidades y aspiraciones de nuestro Pueblo. Continuaremos acometiendo esta encomienda con firmeza y determinación total para seguir dándole a Puerto Rico el **Gobierno Limpio** y de **proyectos limpios** que se merece.

#### Iniciativas para combatir la corrupción
#### encaminadas por la Administración
#### Informe de Resultados

√ **El Departamento de Justicia ha retornado su rol fundamental** de ser el abogado del Pueblo de Puerto Rico y ha encauzado acciones contundentes para brindar a Puerto Rico un **Gobierno Limpio.** El nombramiento de Secretaria de Justicia recayó en una persona de incuestionables principios, cuyo desempeño le ha devuelto a ese Departamento el respeto y la independencia de criterio que siempre lo había caracterizado y sobre todo, el logro de la confianza de los ciudadanos en esta importante institución de ley y orden.

√ **Regulamos los procesos de transición del Gobierno,** para evitar que interrupciones al flujo de información, **contrataciones y**

**nombramientos indebidos motivados por intereses político-partidistas** (Ley Núm. 197 de 18 de agosto de 2002).

√ **Implantamos un proyecto permanente de Auditorías Externas Especiales a las Agencias** y Corporaciones Públicas, como una pieza importante de auto fiscalización del gobierno, que incuye (sic) a esta Administración.

√ **Creamos el cargo de Fiscal General** y Fiscales Especiales Generales por el término de 12 años y asignándole autonomía funcional y económica. (Ley Núm. 83 de 18 de junio de 2002).

√ **Aumentamos en $3 millones el presupuesto de la Oficina del Contralor,** de forma que esta oficina pueda continuar su labor de investigación y encauzamiento de los casos de corrupción.

√ **Creamos la Comisión Independiente de Ciudadanos para Evaluar Transacciones Gubernamentales** ("Blue Ribbon Committee"), **para evaluar las transacciones de las agencias gubernamentales.** La Comisión refirió siete informes al Departamento de Justicia, la Oficina del Contralor y la Oficina de Ética Gubernamental.

√ **Creamos el "Código de Ética para Contratistas y Suplidores".**

√ **Reglamentamos la contratación de parientes en el Gobierno.**

√ **Aumentamos a 20 años el término de la prohibición para contratar con el gobierno a personas convictas en casos de delitos graves** y a 8 en delitos menos graves (Ley Núm. 84 de 29 de julio de 2001).

√ **Aprobamos legislación para que el Gobierno pueda radicar acciones civiles para lograr recobrar indemnización por el triple del daño causado al erario por actos de corrupción y malversación de fondos públicos** (Ley Núm. 36 de 13 de junio de 2001).

√ **Nombramos como fiscales a personas integras** siendo estrictos criterios de competencia profesional y **no por político-partidistas.**

√ **Aprobamos legislación para proteger de represalias** a toda persona que denuncie o informe actos de corrupción contra el Gobierno (Ley Núm. 14 de 11 de abril de 2001).

√ **Promovimos un registro público de demandas** contra las agencias gubernamentales que será ubicado en el Departamento de Justicia.

√ **Radicamos el proyecto de Ley de Dinero Limpio** para reformar el sistema de financiamiento de las campañas políticas.

√ **Introducimos el curso de ética y valores en las escuelas públicas,** como parte de una educación integral para preparar a nuestros estudiantes a alcanzar un crecimiento intelectual, moral y social.

√ **Creamos el Centro para el Desarrollo del Pensamiento Ético** en la Oficina de Ética Gubernamental y le asignamos $2 millones (Ley Núm. 13 de 11 de abril 2001). Todo funcionario público tiene que tomar cada 2 años un mínimo de 10 horas de cursos para mantener un proceso de Educación Continua.

√ **Diseñamos el programa Ética TV,** en los cuales 6 y 3, para orientar a la ciudadanía en la identificación de conflictos de intereses y violaciones a la Ley que le permita denunciar y participar en la lucha contra la corrupción.

√ **Establecimos la Línea Antifraude** (1-800-998-0000) que permite al ciudadano reportar confidencialmente transacciones fraudulentas con la Tarjeta de la Familia.(Énfasis suplido)

En la tercera página del referido folleto aparece una **fotografía de la Gobernadora** y otras personas, reflejando y proyectando el inicio de una obra pública. Dicha página demarca el comienzo de su **"Informe al Pueblo"** sobre su alegada primera prioridad **"Creación de Empleos y Desarrollo Económico"**. En la cuarta página aparece otra **fotografía de la Gobernadora** con un grupo de empleados de una empresa privada en la que continua el

desarrollo del referido tema.  En la sexta página del folleto se hace referencia a una **"visión de desarrollo económico y social a largo plazo estableciendo objetivos concretos y medibles de donde queremos estar  de aquí a 20 años y como lograrlo"**.  **Se le denominó a esta "misión de futuro" "Puerto Rico 2025"**. (Énfasis suplido).

En la séptima página del folleto aparecen dos (2) **fotografías de la Gobernadora** junto con gente.  Allí se comienza a elaborar el tema de las Comunidades Especiales.

En la página nueve (9) se comienza a elaborar y desarrollar el tema de la educación pública.  **Se comienza tal esfuerzo enmarcando la presente obra de gobierno en la realización de un cambio radical al Departamento de Educación de Puerto Rico.  Puntualiza el cambio sobre la diferencia entre la presente administración de gobierno y la pasada.  Hace alusión y enfatiza que la anterior administración de gobierno convirtió esa agencia en una "herramienta político partidista, y donde se llevaron a cabo los actos de corrupción más grandes en nuestra historia".  Contrasta tal escenario con la transformación que la actual administración le ha impartido a dicha agencia que al presente es una "comprometida con la enseñanza y los valores que nos distinguen como pueblo".**

En la página diez (10) del folleto se discute el tema **"cambios Saludables para la Salud de Puerto Rico"**.  Informa sobre la creación de la "tarjeta inteligente".

**Hace alusión a que la anterior administración de gobierno no implantó la "tarjeta de salud" en una "forma coherente, provocando un debacle en el aspecto financiero y afectando al paciente al descuidar la calidad de los servicios". Contrasta tal situación con los esfuerzos de la presente administración en "la disponibilidad de medicamentos, las salas de emergencia 24 horas y una tarjeta de avanzada con más beneficios para los pacientes". Puntualiza que la actual administración estabilizó las finanzas de la Reforma de Salud "por primera vez en 7 años" y detuvo "la venta indiscriminada de facilidades de salud", haciendo referencia directa a la política pública formulada por la anterior administración de gobierno.**

En la página doce (12) elabora y desarrolla el tema de la familia puertorriqueña. Aparece una **fotografía de la Gobernadora** con varios niños. Expresa que el compromiso de la actual administración de gobierno es hacerle justicia y atender las necesidades y aspiraciones de la familia puertorriqueña. **Puntualiza que en ese proceso la presente administración "encarrila a Puerto Rico por un buen camino, por la ruta del futuro", en reconciliación y el respeto.**

En la página catorce (14) aparece una **fotografía de la Gobernadora** junto a varios lideres del área del deporte y la recreación en Puerto Rico.

La última página del folleto, la número quince (15),

reza de la forma siguiente:

### Informe al Pueblo de Puerto Rico
### a Dos Años de Administración

**Nuestra Agenda de Trabajo está claramente definida:**

√ **Gobierno Limpio para Puerto Rico con un ataque frontal a la corrupción.**

√ El desarrollo económico y la creación de empleos como primera prioridad de la gestión pública.

√ Ofrecerle a la familia puertorriqueña programas y proyectos que en realidad contribuyen a mejorar su bienestar y calidad de vida.

**¿Qué encontramos al iniciar nuestra administración dos años atrás?**

- Un **gobierno prácticamente en bancarrota** donde se identificó una deuda extraconstitucional de $1.6 billones que estaban en los libros del Banco Gubernamental de Fomento y para los cuales no se dejaron fuentes de repago.

- **Un déficit estructural de mas de $600 millones que había estado escondido.**

- Más de $100 millones de fondos federales congelados por **los problemas de malos manejos en el Departamento de Educación, Tren Urbano y el Departamento de la Vivienda.**

- **Un nivel de corrupción rampante en diversas agencias** y sobretodo un pesimismo colectivo por la pérdida de credibilidad y confianza en el servicio público y las instituciones de gobierno.

- **Una politización extrema que borró totalmente la línea que debe y tiene que separar el gobierno del partido político y lo público de lo privado.**

- **Un clima de confrontación entre el gobierno y los grupos laborales, religiosos, ambientalistas, grupos cívicos y profesionales, entre otros.**

- Una situación económica de incertidumbre por la pérdida de la Sección 936 y la falta de una agenda coherente para el desarrollo económico del país.

## Nuestro Primer Año 2001: Pusimos la Casa en Orden

√ Estabilizamos las finanzas del Estado Libre Asociado de Puerto Rico.

√ Encaminamos una agenda de trabajo con objetivos específicos.

√ Estimulamos e iniciamos los esfuerzos para mejorar las condiciones de trabajo de los servidores públicos.

√ Pusimos en marcha un plan de trabajo para encaminar el desarrollo económico.

√ Establecimos una forma de gobernar en diálogo y participación ciudadana.

√ Encaminamos una agenda de **Gobierno Limpio** para devolver la confianza del pueblo en sus instituciones.

## Nuestro Segundo Año 2002: Encaminamos la Obra Pública, Establecimos una Agenda Social para un un Nuevo Puerto Rico y Comenzamos a Ver los Logros

√ Encaminamos la inversión en obra pública más grande que se haya hecho, con una inyección de más de $3,000 millones.

√ Recuperación de nuestra economía con importantes expansiones, aumento sin precedentes en las cooperativas, recuperación del turismo y continuación en la baja del desempleo.

√ Implantación de iniciativas específicas para la familia puertorriqueña.

## Año 2003: El Año de la Cosecha y los Grandes Resultados

√ El repunte económico continuará de manera vigorosa.

√ Experimentaremos los resultados de la inversión en obra pública.

√ El asunto de Vieques quedará resuelto.

√ Se encaminarán de forma final los proyectos estratégicos.

√ **Se completarán los proyectos inconclusos y mal manejados por la pasada Administración.**

√ **Se verán los resultados de los Programas de Valores, Escuela Abierta y Horario Extendido.**

√ Comenzaremos la construcción de los Mil Millones en las Comunidades Especiales.

*Puerto Rico hacia el Futuro*
*por Buen Camino*



SILA M. CALDERON
**G O B E R N A D O R A**
**ESTADO LIBRE ASOCIADO**

Estamos enfocados en el futuro de Puerto Rico con optimismo y determinación. Vemos un país con un desarrollo económico sólido, con una obra pública en marcada aceleración, con una educación pública para nuestros niños centrada en nuestros valores. Sobre todo, vemos un Gobierno que imparte justicia a miles de nuestros conciudadanos más necesitados a través del Proyecto Mil Millones. **Un Puerto Rico donde se sanen las heridas de la desconfianza, de la corrupción y de la confrontación.** Un pueblo feliz y solidario, de respeto y de unidad puertorriqueña. Con ese Puerto Rico estamos totalmente comprometidos.(Énfasis suplido)


El 14 de enero de 2003 el licenciado Thomas Rivera Schatz, Comisionado Electoral del P.N.P. le envió una carta al honorable Manuel Díaz Saldaña, Contralor de Puerto Rico solicitando investigación sobre la publicación del referido folleto del gobierno titulado **"Informe al Pueblo de Puerto Rico a Dos Años de Administración 2001-2002".** Se reafirmó en solicitud

previa que le dirigiera a dicho funcionario para la realización de una investigación similar contra la Compañía de Fomento Industrial por haber publicado anuncios utilizando palabras con frases que alegadamente estaban ligadas a campañas del P.P.D. Solicitó del Contralor de Puerto Rico se determinara sobre la legalidad o no del uso de fondos públicos para pautar dichos anuncios en los medios de comunicación.

El 17 de enero de 2003 se publicó un anuncio en el periódico El Nuevo Día sobre el Proyecto Aguinaldo de Empleo Juvenil del Departamento de Educación. En el mismo aparece una **fotografía de la Gobernadora** junto con unos adolescentes. Al final tiene en letras grandes el lema **"Puerto Rico Hacia el Futuro por Buen Camino Sila M. Calderón Gobernadora Estado Libre Asociado"**.

El 6 de febrero de 2003 se publicó un anuncio en el periódico El Nuevo Día sobre los **"Códigos de Orden Público Seguridad y Calidad de Vida para tu familia"**. Dicho anuncio ilustró mediante símbolos la conducta o actuaciones que los Códigos de Orden Público tipifican como violaciones a dicho cuerpo. Contiene al final en letras grandes el lema **"Puerto Rico Hacia el Futuro por Buen Camino Sila M. Calderón Gobernadora Estado Libre Asociado"**. El mismo anuncio se publicó en el Semanario Todo el 13 de marzo de 2003, en el periódico El Vocero el 13 de marzo de 2003, en un periódico no identificado el

20 de marzo de 2003, en el periódico El Vocero el 27 de marzo de 2003.

El 10 de febrero de 2003 el licenciado Thomas Rivera Schatz, Comisionado Electoral del P.N.P. le envió una carta al honorable Manuel Díaz Saldaña, Contralor de Puerto Rico solicitando investigación sobre la utilización de el lema **"Puerto Rico hacia el Futuro por Buena Camino, Sila M. Calderón, Gobernadora Estado Libre Asociado", utilizando predominantemente los colores rojo y amarillo en el referido anuncio pautado en el periódico El Nuevo Día, edición del 6 de febrero de 2003.** Solicitó se determinara sobre la legalidad o no del uso de fondos públicos en la pauta de dicho anuncio.

El 10 de febrero de 2003 el honorable Manuel Díaz Saldaña le cursó comunicación escrita al licenciado Thomas Rivera Schatz, Comisionado Electoral del P.N.P. informándole del Informe de Auditoría DA-03-10 sobre la Oficina Central de Comunicaciones adscrita a la Oficina de la Gobernadora emitido por la Oficina del Contralor de Puerto Rico el 7 de febrero de 2003. El referido informe concluyó sobre la presencia de desviaciones de ley en las operaciones relacionadas con el uso de fondos públicos para divulgar el mensaje de la Gobernadora al país por varios canales de televisión el 19 de marzo de 2002, antes transcrito. El Contralor de Puerto Rico consideró que el propósito principal del referido mensaje televisivo de la Gobernadora era aclarar al país

expresiones, alegaciones y acusaciones contra su campaña a la gobernación. Concluyó que la Gobernadora, así como cualquier otro funcionario público puede tener perfecta autoridad y derecho a defender, con fondos públicos, dentro de un marco de razonabilidad, su reputación, actos y decisiones como funcionario público. No obstante, **no tiene autoridad o derecho en ley para defender con fondos públicos su reputación, decisiones y actos ocurridos cuando era candidato a un puesto electivo y participaba en el proceso político.** Le recomendó a la Gobernadora tomar las medidas necesarias para que no se repitiera la situación antes indicada. Recomendó, además, a la Secretaria de Justicia y al Director Ejecutivo de la Oficina de Ética Gubernamental a considerar la situación comentada en su informe y tomar las medidas correspondientes.

El 1 de marzo de 2003 el periódico El Nuevo Día publicó en su página treinta y cuatro (34) una noticia en la cual aparece una **fotografía mostrando un efusivo abrazo entre la Gobernadora y el Alcalde del Municipio de Carolina.** Dicha **fotografía**, y las expresiones de la Gobernadora recogidas por la periodista señora Sandra Morales Blanes fue en ocasión de la celebración de la asamblea de la Asociación de Alcaldes del P.P.D. Durante su mensaje como oradora principal la periodista consideró que la Gobernadora arremetió **"una vez más"** contra la pasada administración. **Refiriéndose a esa administración**

de gobierno la Gobernadora expresó "Lo que dañaron ellos en ocho años, nosotros lo hemos enderezado en dos". La Gobernadora expresó a los Alcaldes de su partido político "que como parte de un plan establecido para mejorar los servicios de salud municipales se aumentó de 46 a 66 el número de municipios con el servicio de sala de emergencia 24 horas". Anticipó, que para diciembre (2003) "todos y cada uno los municipios" contarán con su propia Sala de Emergencia". Señaló: "La privatización y la venta de los CDT´S (sic) en contra de la voluntad del pueblo... esa política fue el resultado de un gobierno que cerraba sus oídos a los reclamos justos de la familia puertorriqueña. La venta de los CDT´S [sic] estuvo manchada por la corrupción y causó sufrimiento".

El 13 de marzo de 2003 AAFET publicó un anuncio en el periódico El Nuevo Día ofreciendo ayuda a las personas que desearan establecer su propio negocio. Se ofrecieron una serie de servicios para ello. El anuncio fue publicado a colores. Predomina el **rojo y amarillo** en distintas tonalidades. Al final del anuncio tiene en letras grandes el lema **"Puerto Rico hacia el Futuro por Buen Camino Sila M. Calderón Gobernadora Estado Libre Asociado"**. El mismo anuncio se publicó en Primera Hora el 14 de marzo de 2003, en el El Nuevo Día el 16 de marzo de 2003, en The San Juan Star el 16 de marzo de 2003, en Primera Hora el 17 de marzo de 2003, en El Vocero el 19 de marzo de 2003, en un periódico no identificado el 20

de marzo de 2003, en The San Juan Star el 20 de marzo de 2003, en El Nuevo Día  el 21 de marzo de 2003, en Primera Hora el 23 de marzo de 2003, en El Nuevo Día el 23 de marzo de 2003, en The San Juan Star el 24 de marzo de 2003.

El 13 de marzo de 2003  se publicó un anuncio en el periódico El Vocero informando al público que el Gobierno de Puerto Rico trabaja en **horario extendido.** Ofreció información sobre las agencias que trabajan de esa forma.   El anuncio fue publicado a colores. Predomina el **amarillo** en distintas tonalidades.  Al final tiene en letras grandes el lema **"Puerto Rico Hacia el Futuro por  Buen Camino Sila M. Calderón Gobernadora Estado Libre Asociado"**  El mismo anuncio se publicó en El Vocero el 19 de marzo de 2003 y en El Nuevo Día el 26 de marzo de 2003.

El 17 de marzo de 2003 se publicó un anuncio en el periódico El Nuevo  Día  de la Oficina de Asuntos de la Juventud ofreciendo oportunidades de empleo en el sector público y privado a jóvenes mayores de 18 años de edad para la adquisición por esos jóvenes de la  experiencia necesaria.   Al final tiene en letras grandes el lema **"Puerto Rico Hacia el Futuro por Buen Camino Sila M. Calderón Gobernadora Estado Libre Asociado"**.

El 19 de marzo de 2003 se publicó un anuncio en el periódico Primera Hora de la Oficina Estatal de Conservación Histórica invitando a todo licitador

registrado a participar en una subasta pública para el arrendamiento de locales comerciales en el primer piso del Cuartel de Ballajá. El anuncio fue publicado con un fondo **blanco** con diferentes tonalidades de **amarillo y rojo.** Al final tiene en letras grandes el lema **"Puerto Rico Hacia el Futuro por Buen Camino Sila M. Calderón Gobernadora Estado Libre Asociado"** El mismo anuncio se publicó en El Vocero el 20 de marzo de 2003 y en Primera Hora el 21 de marzo de 2003.

El 20 de marzo de 2003 el Departamento del Trabajo de Puerto Rico publicó un anuncio en el periódico El Vocero ofreciendo **servicios al trabajador desempleado o desplazado.** El anuncio fue publicado en un fondo **blanco.** Predomina el **rojo y amarillo** en diferentes tonalidades. Al final tiene el lema **"Puerto Rico Hacia el Futuro por Buen Camino Sila M. Calderón Gobernadora Estado Libre Asociado".** El mismo anuncio fue publicado en Primera Hora el 20 de marzo de 2003, en El Nuevo Día el 20 de marzo de 2003, en el Nuevo Día el 23 de marzo de 2003, en El Vocero el 27 de marzo de 2003 y en El Nuevo Día el 27 de marzo de 2003.

El 21 de marzo de 2003 Promo Export publicó un anuncio en el periódico El Nuevo Día invitando a las pequeñas y medianas empresas a un **seminario** denominado "Hong Kong: Plataforma hacia el Mercado de China" a celebrarse en el Hotel Wyndham Old San Juan. El anuncio fue publicado a colores. Predomina el **rojo y amarillo**

en distintas tonalidades. Al final tiene en letras grandes el lema **"Puerto Rico Hacia el Futuro por Buen Camino Sila M. Calderón Gobernadora Estado Libre Asociado"**. El mismo anuncio se publicó en El Nuevo Día el 24 de marzo de 2004.

El 25 de marzo de 2003 la Junta Examinadora de Quiroprácticos adscrita al Departamento de Salud convocó a un **examen de reválida** el 22 de mayo de 2003 mediante un anuncio publicado en El Nuevo Día. Al final tiene en letras grandes el lema **"Puerto Rico Hacia el Futuro por Buen Camino Sila M. Calderón Gobernadora Estado Libre Asociado"**.

El 25 de marzo de 2003 el Departamento de Agricultura publicó un anuncio en el periódico Primera Hora, dirigido a los caficultores, de naturaleza informativa y ofreciendo ciertos beneficios e incentivos para aquellos agricultores que recolectaran el café ya maduro. El anuncio tiene un fondo **blanco** con diferentes tonalidades de **amarillo y rojo**. Al final tiene en letras grandes el lema **"Puerto Rico Hacia el Futuro por Buen Camino Sila M. Calderón Gobernadora Estado Libre Asociado"**.

El 1 de abril de 2003 el Departamento de Salud publicó un anuncio que contenía un **aviso de subasta** para realizar mejoras al sistema de distribución eléctrica del Hospital Regional de Bayamón. Al final tiene en letras grandes el lema **"Puerto Rico Hacia el Futuro por Buen**

**Camino Sila M. Calderón Gobernadora Estado Libre Asociado".**

El 12 de junio de 2003 se publicó un anuncio en el periódico El Nuevo Día de la Oficina de Asuntos de la Juventud ofreciendo un **programa de viajes estudiantiles y culturales** a ciertos países de Latinoamérica. Al final tiene en letras grandes el lema **"Puerto Rico Hacia el Futuro por Buen Camino Sila M. Calderón Gobernadora Estado Libre Asociado".**

En el folleto "Informe al Pueblo" aparecen varias **fotografías de la Gobernadora** junto a grupos de personas de diferentes sectores de la comunidad puertorriqueña ilustrando las mismas junto al mensaje escrito que cumplió en los dos primeros años del cuatrienio la encomienda que **"nuestro pueblo"** le encomendó en las elecciones generales noviembre de 2000 de llevar a cabo **"una gestión gubernamental abarcadora para encarrilar su futuro"** en tres áreas básicas **"brindarle al país el gobierno limpio que necesita y merecen los puertorriqueños, hacer del desarrollo económico y la creación de empleos la primera prioridad del servicio público y ofrecerle a la familia puertorriqueña programas y proyectos que contribuyan a mejorar su bienestar y calidad de vida".**

Proyectó su obra de gobierno, en los primeros dos (2) años del cuatrienio con el lema **"Por Buen Camino".** Informa que han estado combatiendo la corrupción de la

anterior administración de gobierno, atacando directamente al principal partido político de oposición, destacando y contrastando la gestión del partido político en el poder (P.P.D.) del anterior (P.N.P.) como una que está ofreciendo un **gobierno limpio.** En su campaña política frente a las elecciones generales del año 2000 el mensaje de la Gobernadora para proyectar en el campo político a su partido político (P.P.D.) y su candidatura como alternativa contenía el compromiso de **"gobierno limpio y transparente"** por constituir el gobierno de turno, en aquel momento, del partido político adversario al suyo, uno que alegadamente era corrupto y que no había ofrecido el **"gobierno limpio que necesita y merecen los puertorriqueños"**.[44] Durante el desarrollo de los temas de desarrollo económico, educación y programas para la familia puertorriqueña se llevó a cabo un ataque a la pasada administración, destacando su obra de gobierno y a la misma vez contrastándola con lo considerado como negativo de la anterior administración de gobierno. Termina el referido folleto con el lema **"Puerto Rico Hacia el Futuro por Buen Camino", Sila M. Calderón Gobernadora Estado Libre Asociado".** El folleto informativo tenia el propósito claro y deliberado de proyectar positivamente al partido

---

[44] Tomamos conocimiento judicial que el tema principal de la campaña de la Gobernadora en las elecciones del 2000 constituía imputaciones sobre alegados actos de corrupción de miembros de la anterior administración de gobierno y al ofrecimiento por su partido político como alternativa de un **"gobierno limpio y transparente"**.

político en el poder (P.P.D.) **"Hacia el Futuro"**, o sea las elecciones generales del 2004 y negativamente al partido político de oposición (P.N.P.). Por eso el Tribunal de Primera Instancia concluyó que ese documento informativo claramente le confería una ventaja a la Gobernadora y a su partido político (P.P.D.). No obstante, no consideró los demás anuncios como parte de un designio y plan común y que respondieran a una campaña coherente y coordinada entre la Oficina de la Gobernadora y de las agencias y dependencias del gobierno que han publicado dichos anuncios a lo largo y a lo ancho de Puerto Rico en televisión, radio, prensa escrita y con letreros con **idéntico lema en TODOS**, en algunos con la **fotografía** de **la Gobernadora**, y en casi todos con los colores **rojo y amarillo** y sobre las mismas áreas de gobierno, temas y materias que cubre el referido folleto informativo. Durante las campañas políticas del 1996 y el 2000 lideres del partido político de la Gobernadora (P.P.D.) utilizaron el referido **lema** en forma igual o parecida, en su totalidad o en parte, con el mismo propósito y objetivo de naturaleza político partidista. Durante los trabajos de la asamblea de la Asociación de Alcaldes que agrupa los alcaldes del partido político en el poder (P.P.D.) celebrada en el mes de febrero de 2003, o sea cuando se estaba llevando a cabo la campaña gubernamental impugnada, la Gobernadora en carácter y función de oradora principal expresó que su gobierno

había enderezado en dos (2) años lo que en el anterior gobierno había dañado en ocho (8) años. Hizo referencia en su mensaje a áreas, temas y materias, algunos cubiertos por el folleto informativo y los anuncios antes descritos, entre otros. No obstante, lo que le imprimió claramente coherencia al plan y designio político-partidista fue el **lema común** contenido en **TODOS** los anuncios y letreros que al definir el tiempo presente **Por Buen Camino** tenía la intención clara de proyectar **Hacia el Futuro** al partido político en el poder (P.P.D.).

Los anuncios de prensa escrita y colocados en letreros a lo largo y lo ancho de Puerto Rico contienen en una forma u otra un mensaje que podría perseguir un **"fin público"**. No obstante, el referido mensaje no puede co-existir y estar enmarcado como parte de un mensaje político partidista, con **fotografías del gobernante**, con **los colores que usó de distintivo en sus campañas políticas, con un lema claramente de corte político partidista** que le imparte coherencia a un plan y designio común de favorecer y brindarle una ventaja al partido político en el poder (P.P.D.) en las próximas elecciones, pues coinciden con las posiciones de sus líderes en el debate político. La utilización de **fotografías del gobernante, los colores que lo identificaron en sus campañas político-partidistas** y de **lemas** claramente de esa naturaleza no constituyen el beneficio incidental que podría obtener el partido político en el poder cuando

divulga anuncios con un **"fin público"**. Los anuncios legítimos y válidos que tienen el propósito de informar sobre la política pública formulada por el Gobierno rinden un **"fin público"**. Si resultara que benefician incidentalmente al partido en el poder por identificarse la ciudadanía con la política pública formulada no existe ilegalidad alguna por producirse tal resultado. No obstante, está prohibido manipular anuncios legítimos para obtener una ventaja política. Lo que esta vedado es incluir en tales anuncios **mensajes políticos, fotografías del gobernante**, junto a **lemas y colores** que son distintivos de un partido político para **forzar ese resultado**. La evidencia presentada en el caso de autos demostró que en cada uno de los mensajes, anuncios y letreros que fueron parte de la campaña gubernamental impugnada la expresión común en cada uno de ellos fue utilizada como un vehículo para ofrecerle una ventaja indebida e ilegal al partido político en el poder (P.P.D.) frente a las elecciones generales de 2004. Tal expresión común constituyó una ventaja económica al P.P.D. sobre los partidos políticos de oposición. Cualquier ventaja que tenga el partido político de gobierno mediante la utilización de los fondos públicos constituye una desigualdad, por lo que esta proscrita. No hay espacio es este asunto para distinciones de grado. Si el desembolso de esos fondos que pertenecen a todo el pueblo adelanta, de cualquier manera, los intereses del

sector político en el poder, ello constituye una ventaja sobre los otros sectores políticos, sea esta grande o pequeña. Lo ilícito de tal ventaja no depende de su dimensión, sino de su ínsita inequidad. Todas están prohibidas porque inherentemente aparejan la desigualdad.

En cuanto al mensaje televisivo impugnado concluimos que padece del mismo mal de la ilegitimidad por el uso de fondos públicos para su divulgación. Su contenido sustancialmente refleja una contestación de la Gobernadora a un ataque e imputaciones que le dirigieran sus adversarios políticos por alegadas actuaciones suyas y de lideres de su partido político durante la campaña política del 2000. También contiene un ataque a alegadas actuaciones de la anterior administración de gobierno. El contenido del referido mensaje relativo al referimiento de dicho asunto a las agencias con autoridad para investigar o evaluar las imputaciones tienen un **"fin público"**. No obstante, tal objetivo constituyó uno mínimo en términos del propósito informativo del mensaje tomando en cuenta la extensa contestación y defensa que realizó la Gobernadora sobre las imputaciones que le dirigieron como candidata a dicho cargo durante el proceso político del 2000, y el ataque a sus adversarios políticos. Dicha parte del mensaje contiene su posición sobre los méritos del asunto que refirió a las agencias de gobierno. Dicho mensaje tuvo el propósito de darle

una ventaja indebida e ilegal a la Gobernadora y a los líderes de su partido político, también imputados, no sólo en la arena y el debate político sino también sobre la evaluación de los méritos que en su día habrían de realizar las agencias de gobierno que les refirió el asunto.

Concluimos que en este caso nos encontramos ante una campaña publicitaria concertada y coordinada entre la Oficina de la Gobernadora, las agencias y dependencias del gobierno y líderes del P.P.D. de manifiesto y claro corte político-partidista, subvencionada con una extensa y masiva cantidad de fondos públicos, so pretexto de cumplir con un **"fin público"** determinado. La utilización de **mensajes políticos, fotografías del gobernante, sus colores distintivos en la arena política y lemas de naturaleza política partidista** en la referida campaña gubernamental es contraria al **"fin público"** que exige nuestro ordenamiento constitucional en la administración del erario y al axioma de paridad económica sobre las fuerzas electorales que le sirve de norte.

De la evidencia que tuvo ante sí el Tribunal de Primera Instancia surge en forma palmaria el propósito de los demandados de influenciar la opinión pública a favor del partido de gobierno (P.P.D.) mediante una masiva campaña de medios en forma concertada y originada en la Oficina de la Gobernadora, y coordinada con las agencias y dependencias de gobierno y líderes del P.P.D. que

indican la presencia de unos elementos unitarios y de que había una dirección. Si algún objetivo público se logró con la campaña gubernamental impugnada y los anuncios publicados en su carácter individual palidece ante la deslumbrante campaña publicitaria que llevó a cabo el Gobierno con el fin obvio de proyectar positivamente al P.P.D. y negativamente al P.N.P. frente a las próximas elecciones generales. A tenor con el Art. VI, Sec. 9 de la Constitución de Puerto Rico, *supra,* no es válido ni permisible el uso de fondos públicos para campañas publicitarias o de propaganda realizadas por el Gobierno de carácter político-partidista ya sea clara, directa, indirecta, sutil, disimulada, sofisticada o esté entremezclada con actividades informativas y legitimas.

No nos corresponde pasar juicio sobre la sabiduría de los gastos incurridos en publicidad, siempre que éstos tengan un **"fin público"**. Tomando conocimiento judicial de ello nos preocupa la masiva proliferación a lo largo y ancho de la Isla de letreros con anuncios de agencias o dependencias de gobierno similares o idénticos a los aquí evaluados, aparentemente con fondos públicos.

Concluimos que no es válido ni permisible el uso de fondos públicos para anuncios y campañas de gobierno publicitarias o propagandistas de carácter político partidista. El análisis de la TOTALIDAD de la campaña impugnada refleja claramente una intención político-partidista con un disfraz muy tenue. No es disimulada,

ni sutil o indirecta. Su valor informativo y el beneficio para el ciudadano es mínimo y está subordinado a la exaltación de la figura u obra del partido de gobierno (P.P.D.). No tenemos duda alguna que la referida campaña constituyó un instrumento para moldear, formar, canalizar y dirigir la opinión pública hacia un eventual triunfo electoral del P.P.D. en las elecciones del 2004. Los funcionarios del Gobierno de Puerto Rico no tienen derecho a usar el dinero público para la reelección del partido político en el poder. El Estado y la administración de gobierno de turno no son sinónimos. El monopolio que tiene el Gobierno sobre el uso de la fuerza como factor coercitivo junto a sus inmensos recursos económicos lo hacen propenso a la arbitrariedad. Tales recursos se convirtieron en el presente caso en poderes de persuasión y coacción que constituyeron una amenaza a la legitimidad de nuestra democracia por lesionar derechos constitucionales de electores de un sector político en Puerto Rico.

Indiscutiblemente el Gobierno de Puerto Rico se extralimitó en su facultad o deber de mantener al Pueblo informado, violando de esta forma la disposición constitucional que limita la utilización de fondos públicos a un **"fin publico"** y al principio constitucional de igualdad económica de los partidos y candidatos a puestos electivos y de sus electores. Por tal motivo respetuosamente DISENTIMOS del curso de acción del

Tribunal. Expediríamos el recurso para revocar al Tribunal de Apelaciones y al Tribunal de Primera Instancia y emitir el injunction solicitado, para prohibir a los funcionarios demandados y al Estado Libre Asociado de Puerto Rico la publicación costeada con fondos públicos de mensajes anuncios radiales, televisivos, de prensa escrita y letreros de los mencionados anteriormente, y para extender tal prohibición a sus agentes, funcionarios, mandatarios y empleados, ya sea que éstos actúen solos o de común acuerdo con otras personas. Prohibiría, además, al Estado Libre Asociado de Puerto Rico, a los demás demandados y a sus agentes, funcionarios, empleados y mandatarios, el desembolso de fondos públicos para el pago de las publicaciones hechas de tales anuncios y letreros.

Ordenaría, además, la devolución de este caso al Tribunal de Primera Instancia para evaluar la reclamación de la parte demandante relacionada con daños económicos, atendido lo resuelto por este Tribunal en <u>P.P.D. v Gobernador I</u>, *supra,* a esos efectos, aún cuando la parte demandante en ese caso no había formulado reclamación similar a la presentada en el caso de autos.


IV

La justicia debe ser inmaculada no sólo en su realidad interior sino también en su apariencia

externa.[45]   Sobre este particular es de vital importancia la **consistencia**. Ser **consistentes** nos brinda tranquilidad de conciencia.   La **inconsistencia** puede resultar en la injusticia.

Debemos  siempre tratar de utilizar **la misma vara de medir**.[46]  De otra forma, existe el peligro, en un caso como el presente, de colocar o tratar a electores pertenecientes a sectores políticos distintos frente a actuaciones iguales o similares del Gobierno de Puerto Rico de forma injusta y, además, violatoria a sus derechos a la igual protección de las leyes y a un debido proceso de ley protegidos por la Constitución de Puerto Rico y la  Constitución de Estados Unidos.

Es correcto que la **consistencia** en nuestras decisiones  no es una garantía absoluta de la corrección de las mismas.  No obstante, no hay duda que esta es de gran importancia.  Ser **consistentes**  le imprime estabilidad, confiabilidad y credibilidad a nuestro sistema de justicia y mas importante aún, en casos como el presente, le imprime vivencia a nuestra democracia constitucional.

V

Por   los   fundamentos   antes   expuestos respetuosamente DISENTIMOS del curso de acción de este

[45] In re Rodríguez Torres, 104 D.P.R. 758, 766 (1926).

[46] García Colón v De Jesús López, 124 D.P.R. 708, 714 (1989), expresiones particulares del Juez Asociado señor Rebollo López.

Tribunal.  Expediríamos el recurso y revocaríamos  las sentencias  dictadas por el Tribunal de Apelaciones y el Tribunal de Primera Instancia y devolveríamos el caso a este último  para que continúen  los procedimientos a tenor con lo aquí pautado.


Efraín  E. Rivera Pérez
Juez Asociado